**Jesus RAMIREZ, et al., Plaintiffs,**

v.

**Jack E. WEBB, et al., both individually and in their official capacity as agents of the Immigration and Naturalization Service, et al., Defendants.**

No. K81–344.

United States District Court,
W.D. Michigan, S.D.

Aug. 7, 1989.

Michigan Migrant Legal Assistance Project, Inc. by Philip R. Riley, Gary Gershon, Scott Stensaas, Janice R. Morgan, Berrien Springs, Mich., Farmworker Justice Project by Christine Poplawski, Washington, D.C., for plaintiffs.

John Smietanka, U.S. Atty. by Agnes Kempker–Cloyd, Asst. U.S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

ENSLEN, District Judge.

On July 24, 25 and 26, 1989, the Court held a bench trial on the *Bivens* claims presented by plaintiffs Alfredo Solis Jr., Alfredo Solis III, and Joe Manuel Solis. These plaintiffs claim that the defendant, United States Border Patrol Agent Jerry L. Buzaitis, violated their Fourth Amendment right to be free from unreasonable seizures of their persons when he detained and questioned them without reasonable suspicion that they were illegal aliens. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) on those claims.

### *Findings of Fact*

Plaintiff Joe Manuel Solis is an American citizen born in Wauchula, Florida on April 4, 1967. He was 14 years old when the incident at issue occurred. At that time, he was 5′4″ tall and weighed approximately 110 pounds. Plaintiff Alfredo Solis III is an American citizen born in Wauchula, Florida on April 16, 1966. He was 15 years old at the time of this incident. Plaintiff Alfredo Solis, Jr. is an American citizen born in Pharr, Texas on February 28, 1945. He is the father of Joe Manuel Solis and Alfredo Solis III. Rebecca Solis is an American citizen born in Dallas, Texas on January 16, 1949. Although not a plaintiff in this action, she is married to Alfredo Solis, Jr. and is the step-mother of Joe Manuel Solis and Alfredo Solis III. Each member of the Solis family is an American citizen of Hispanic descent. At the time relevant to this suit, the Solis family were migrant farmworkers who traveled to Idaho, Texas, Florida and Michigan harvesting fruits and vegetables. On October 4, 1981, they resided in Belding, Michigan at the migrant labor camp of Doug Geldersma, for whom they worked harvesting apples.

Defendant Jerry Buzaitis has been a United States Border Patrol Agent since 1977. After an initial training period, he was stationed in San Isidro, California, a town on the Mexican border, where he remained until he transferred to Sault Ste. Marie, Michigan in March, 1981. At the time of this incident Agent Buzaitis had never been involved in a farm and ranch check. His experience as a Border Patrol Agent was limited exclusively to work at an international border. At all times relevant to this suit, Agent Buzaitis believed he had the authority to temporarily detain or seize a person if he had a reasonable suspicion that the person was an alien. During the course of this litigation, he learned for the first time that he could seize a person only if he had a reasonable, articulable suspicion of illegal alienage. Although Agent Buzaitis knew in 1981 that some migrant farmworkers were illegal aliens, he had no idea what percentage of migrant farmworkers were citizens or lawful resident aliens and what percentage were illegally present in this country.

On October 4, 1981, Agent Buzaitis drove to Belding, Michigan in a marked Border Patrol car, where he was to meet other agents and participate in a farm and ranch check detail. A farm and ranch check is

designed to discover and apprehend illegal aliens working as migrant farmworkers. Agent Buzaitis arrived in Belding before the other agents and parked his car in a gas station parking lot at the corner of M–44 and Bridge Street to wait for his superior. M–44 is a busy street and there was much traffic. Some passersby noticed Agent Buzaitis' car as it sat parked in the lot.

On the afternoon of the same day, Joe Manuel Solis, Alfredo Solis III and Alfredo Solis Jr. left their home at the Geldersma farm and drove into Belding to use a pay phone. They were going to call their grandmother who lives in Dallas, Texas. The men drove to Belding in Alfredo Solis Jr.'s 1972 Dodge pickup truck with Alabama license plates. The Solis plaintiffs were wearing ordinary "American" clothes, such as Levis, button-down shirts and boots. Joe Manuel wore a wide-brimmed black hat. The boys had done some work that morning and did not change their clothes before going to Belding. Their clothes may have been somewhat soiled and there may have been dust on their boots.

The Solis plaintiffs drove to a public phone in a parking lot located across the street from the parking lot where Agent Buzaitis parked his car. None of the Solis plaintiffs noticed Agent Buzaitis sitting in his parked car. Joe Manuel and Alfredo III got out of the truck and stood next to the pay phone while their father remained in the truck, speaking to them and teaching them how to make a long distance phone call. The boys were paying attention to their father and were not aware of things happening around them.

Agent Buzaitis stared at the boys through binoculars from his vantage point across the street. He does not recall how long he surveilled them from his car. Agent Buzaitis did not see the boys' father, who remained seated in the pickup truck. Agent Buzaitis testified that he observed two males who appeared to be of Hispanic descent standing next to a pickup truck with their backs toward him. One of the males wore a black wide brimmed hat and appeared to be shielding his face. Both were wearing dirty field clothes. Agent Buzaitis testified that he believed the men to be nervous, and that they were looking at the ground as if to avoid his gaze. He could not hear what the men he saw were saying and did not know they were talking to someone in the truck.[1] Based on these observations, Agent Buzaitis believed the men were migrant farmworkers and were possibly illegal aliens.

Agent Buzaitis then drove his car across the street and got out to question the boys further. He parked his car in front of and slightly to the right of the pickup truck, to prevent it from driving away. The Solis boys first noticed Agent Buzaitis when he closed his car door to approach them. Agent Buzaitis was armed and in uniform. The plaintiffs did not realize at first that he was a Border Patrol Agent or an employee of the Immigration and Naturalization Service. Agent Buzaitis did not verbally identify himself.

As he approached the boys, Agent Buzaitis said in English either "How's it going?" or "What are you doing here?" Alfredo Solis Jr. answered from the truck, "We are making a phone call. Is that against the law in this town?" Agent Buzaitis asked Alfredo Solis III whether he was an American citizen or where he was born. Alfredo Solis III answered in English that he was a citizen. I find that Alfredo Solis did not produce a birth certificate. Agent Buzaitis asked Joe Manuel Solis whether he was an American citizen, or where he was born. Joe Manuel answered in English that he was a citizen. Agent Buzaitis asked Joe Manuel several questions regarding his sta-

---

1. These were the factors Agent Buzaitis testified he considered in deciding whether to question the boys further. In a report written shortly after the incident, Agent Buzaitis mentioned the same observations, except that he did not state that the boys were looking at the ground. I find Agent Buzaitis' testimony in this regard to be credible. I further find that Agent Buzaitis concluded, based on these observations, that one or both boys were illegal aliens. As I will discuss later, this conclusion was unreasonable and was not based upon articulable, objective facts leading to a reasonable suspicion of illegal alienage.

tus, and repeated some of these questions even after Joe Manuel answered them. Both boys believed Agent Buzaitis posed the questions in an aggressive, demanding manner. Although I find that Agent Buzaitis asked the questions in an authoritative tone of voice, and that he pointed at each boy as he spoke, I do not find that he had his hand on his gun or that his conduct was overly aggressive or outside the bounds of reasonable behavior by a law enforcement officer. I further find that neither boy produced a birth certificate or other documentation.[2]

As Agent Buzaitis questioned the boys, Alfredo Solis Jr. attempted to explain that he was the boys' father and an American citizen. Agent Buzaitis was unaware of these comments, either because he did not hear them or because he was intent on questioning the boys. After Alfredo III and Joe Manuel had indicated that they were American citizens, Agent Buzaitis continued to question Joe Manuel in an aggressive manner. At this point, Alfredo Solis Jr. said to the boys, "Get in the truck. This man is harassing you," or words to that effect. Alfredo Solis III walked around the front of the truck while Joe Manuel walked around the back to get to the passenger side. Neither boy ran. Agent Buzaitis followed Joe Manuel around the truck to prevent him from getting in.

Agent Buzaitis caught up with Joe Manuel as the boy reached the door of the truck. He grabbed Joe Manuel with both hands and swung the boy around to face him. Agent Buzaitis may have pulled the boy toward him to restrain him from fleeing. Although I do not find that Agent Buzaitis used the degree of force testified to by plaintiffs, I find that he did use some force in preventing Joe Manuel from entering the truck and that due to this use of

force Joe Manuel suffered a bruise on his chest. In short, I conclude that the degree of force used was neither as egregious as plaintiffs' claim nor as benign as the defendant claims.

Alfredo Solis III was frightened by this conduct. He continued to stand in front of the truck because he was frightened that Agent Buzaitis would grab him if he tried to get in the truck. Alfredo Solis Jr. was also concerned for his own safety and that of his sons. Both were angered by the incident and Alfredo Solis III was embarrassed, thinking that passersby might think he and his brother were criminals.

Continuing his hold on Joe Manuel, Agent Buzaitis forced the boy to walk with him to the nearby patrol car. Joe Manuel walked with some reluctance. I believe it an exaggeration to say that he was "dragged" to the car by Agent Buzaitis, but I find that he did not willingly accompany the agent to the car. Agent Buzaitis pushed Joe Manuel against the hood of his patrol car. Again, although I find that Agent Buzaitis used some force at this point, I believe it an exaggeration to say that Joe Manuel was "slammed" against the hood of the car. I find, however, that the degree of force used was unreasonable under the circumstances, given the plaintiff's age and size, and the fact that Agent Buzaitis did not believe him to be armed or assaultive.

At this point, Alfredo Solis Jr. got out of the truck and rushed to the patrol car, yelling at Agent Buzaitis to stop assaulting his son. Alfredo Solis Jr. heatedly explained that he was an American citizen and the boy's father. Agent Buzaitis asked Mr. Solis for some identification and Mr. Solis produced a Florida drivers license and an army registration card. Defendant Buzaitis believed Mr. Solis to be an Ameri-

---

**2.** I find their testimony in this regard not to be credible because I believe that, had Agent Buzaitis been presented with such documentation, he would have ceased questioning the boys, as he promptly did when he realized their father was a citizen. I further believe that, if the plaintiffs had produced this documentation and had it been ignored as they claim, they would have mentioned these facts in the police reports they filed later that day. Finally, I believe that, if the boys had produced birth certificates, they would have produced those birth certificates at trial. As the record now stands, the only birth certificate Alfredo Solis III introduced into evidence was one he procured three weeks after this incident. Defendants obtained and introduced a birth certificate for Joe Manuel Solis.

can citizen because he spoke English well, even when very angry, and because he neither ran away nor acted in the docile manner typical of illegal aliens confronted with immigration authorities. Agent Buzaitis released Joe Manuel. Agent Buzaitis looked at Alfredo Solis Jr.'s identification and handed it back. Mr. Solis would not take it from him. Agent Buzaitis either placed the identification on the hood of his car or it dropped to the ground. I think it unnecessary to resolve that minor factual dispute.

Alfredo Solis Jr. was very upset and asked for the agent's name and badge number. Agent Buzaitis pointed at his name tag. Alfredo Solis Jr. sent his son Alfredo III to get a piece of paper and pen. He then wrote down the defendant's name and the license plate number of his car. Alfredo Solis Jr. demanded to speak to the agent's supervisor. Agent Buzaitis informed him that his supervisor would be there at 5:00 and that they could meet in the parking lot at that time to discuss the incident.

The Solis family left the parking lot and returned home to pick up Mrs. Solis. They returned to the parking lot, arriving shortly before 5:00 p.m., to wait for Agent Buzaitis and his supervisor. They waited for about ten minutes and left when no one appeared.[3] They then went to the Belding Police Department, located about three blocks away, where they filed a complaint against Agent Buzaitis. All three men gave written statements concerning the incident. These statements are, with minor exceptions, consistent with the plaintiffs'

testimony at trial. Each statement indicates that Agent Buzaitis repeatedly questioned Joe Manuel regarding his citizenship despite the fact that Joe Manuel had already answered the questions. All the statements indicate that Agent Buzaitis grabbed Joe Manuel by the coat, shook him and threw him against the hood of the patrol car. As I indicated above, I believe these statements to be a slight exaggeration, but I also find that Agent Buzaitis used force to detain Joe Manuel and that the degree of force used was unreasonable under the circumstances.

As a result of Agent Buzaitis' conduct in interrogating Alfredo Solis III concerning his citizenship in an aggressive manner, and as a result of Agent Buzaitis' conduct in grabbing Joe Manuel Solis and forcing him to the patrol car, plaintiff Alfredo Solis III was afraid for his own physical safety and security. Alfredo Solis III was also embarrassed by the incident and was afraid that he might also be grabbed by the defendant. As a result of the same conduct, Alfredo Solis, Jr. felt outrage and fear for his own safety and that of his sons. As a result of Agent Buzaitis' repeated questioning of Joe Manuel Solis, his actions in grabbing Joe Manuel and forcing him to the patrol car, Joe Manuel suffered a bruise on his chest, back pain, shock, fear of the defendant, humiliation, embarrassment, nightmares about the incident and other emotional distress.

I do not find that any of these injuries were particularly severe. The Solises admit that Joe Manuel was not in need of medical attention for his injuries.[4] I find it

---

**3.** Agent Buzaitis met with his supervisor and returned to the parking lot sometime shortly after the Solis plaintiffs left to file their complaint. The two agents then travelled approximately 15 miles to the county jail in Ionia, Michigan, where Agent Buzaitis prepared a memorandum describing his version of the incident at the request of his supervisor. While at the county jail, Agent Buzaitis' supervisor received a phone call from the Belding Police Department and spoke with Mrs. Solis on the telephone. When no action was taken on their criminal complaint, and the discussion with Agent Buzaitis' supervisor failed to satisfy them, the Solis family filed an administrative complaint with the United States Border Patrol of-

fice in Detroit, Michigan. They later filed this lawsuit.

**4.** After filing their complaints, the Solis family went to the Belding Community Hospital to seek medical treatment for Joe Manuel. Mrs. Solis testified they were primarily concerned to find out whether he had any internal injuries. Mrs. Solis entered the hospital and her husband followed her. The boys stayed in the car. Mrs. Solis was told she should seek treatment at a nearby clinic for migrant workers. The Solises went to the clinic, but it was closed. They later decided that Joe was not seriously injured and thus did not seek further medical treatment.

significant in this regard that Doug Geldersma, the plaintiffs' employer, who testified that he knew the boys and liked them, was told of the incident but not of Joe Manuel's injuries. Had those injuries been severe, I think it likely they would have been brought to Geldersma's attention. These findings go to the extent of damages, however, and not to the existence of liability. A constitutional violation, even one resulting in minor injuries, is nonetheless a violation meriting a remedy. *See McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir.1988) ("[O]ur court has repeatedly found that a totally gratuitous blow with a policeman's nightstick may cross the constitutional line and, as we said in [*Lewis v. Down*, 774 F.2d 711, 714 (6th Cir.1985)], 'we do not believe that a serious or permanent injury is a prerequisite to a claim [for excessive force]' ").

### Conclusions of Law

 Immigration authorities or other law enforcement officials may detain an individual for a brief period of interrogation where the circumstances create a reasonable suspicion that the individual is engaged in illegal activity. In this case, the relevant illegal activity is that the individual is illegally present in this country. *United States v. Cortex*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Lamas*, 608 F.2d 547 (5th Cir.1979); *United States v. Lopez*, 564 F.2d 710 (5th Cir.1977); *Ojeda–Vinales v. Immigration and Naturalization Service*, 523 F.2d 286 (2d Cir.1975). This law was clearly established by the Supreme Court's opinions in *Brown, Terry* and *Brignoni–Ponce* by 1981. A seizure within the meaning of the Fourth Amendment occurs when a reasonable person would not feel free to leave in light of the official's use of physical force or display of authority. *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).

 Hispanic appearance, standing alone, is not sufficient to create a reasonable suspicion of illegal alienage. *Brignoni–Ponce*, 422 U.S. at 885–87, 95 S.Ct. at 2582–83. An individual's failure to make eye contact with a law enforcement official is also insufficient to create a reasonable suspicion of illegal alienage. *United States v. Munoz*, 604 F.2d 1160, 1161 (9th Cir.1979); *United States v. Lamas*, 608 F.2d 547, 549–50 (5th Cir.1979); *United States v. Lopez*, 564 F.2d 710, 712 (5th Cir.1977). Factors such as evasive or erratic behavior, previous experience with illegal aliens in the area, and a manner of dress or speech indicating foreign citizenship may create reasonable suspicion. *Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. at 2581.

 Law enforcement officials may approach an individual and inquire whether that person will answer their questions, or even ask that person a question, without having reasonable suspicion of wrongdoing. However, in order to detain that person against their will for any length of time, the official must have a reasonable suspicion of illegal activity. *Brown*, 443 U.S. at 53, 99 S.Ct. at 2641–42; *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984). A person's refusal to answer questions may not be considered in determining whether reasonable suspicion to detain exists. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983). A court must consider whether reasonable suspicion justifies a detention based upon the totality of the circumstances known to the detaining officer at the time the seizure occurs. Facts learned after the seizure takes place are irrelevant to this analysis. *United States v. Cortex*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

 All three plaintiffs were seized within the meaning of the Fourth Amendment when Agent Buzaitis grabbed Joe Manuel Solis. Joe Manuel was obviously not free to leave, because he was being physically restrained from doing so. Alfredo Solis III quite reasonably believed that he was not

free to leave, because he saw what happened to his younger brother when he tried to do so. I further find that, had Alfredo Solis III attempted to leave, Agent Buzaitis would have attempted to prevent him from doing so. Alfredo Solis Jr. was seized because he witnessed the seizure of his sons, and thus reasonably believed that he was not free to leave, and because Agent Buzaitis' patrol car blocked his exit from the parking lot.

■ I further find that these seizures were unreasonable within the meaning of the Fourth Amendment. There were no objective, articulable facts creating a reasonable suspicion that these individuals were illegally present in this country. They spoke English. When the agent approached them, they did not attempt to flee the scene. Rather, they stayed and answered his questions. Their clothes did not appear to come from a foreign country, although they were typical of the clothing worn by farmworkers. The fact that they were farmworkers of Hispanic descent is insufficient to allow a reasonable person to conclude that they were illegal aliens.

■ I further find that the fact that they did not look at Agent Buzaitis' vehicle when it was parked across the street from them is insufficient to create reasonable suspicion. First, it is clear that they did not look at the car because they did not see it. Second, even Agent Buzaitis recognized that their backs were turned toward him, indicating that they could not have seen his car. Third, even if they faced Agent Buzaitis, there is no indication that they exhibited evasive behavior. He did not indicate that they appeared to recognize him and then look away or turn their backs. Agent Buzaitis had no good reason for going to the parking lot in the first place, and once there, he had absolutely no justification for seizing these individuals.

■ I further find that the degree of force used by Agent Buzaitis when detaining Joe Manuel Solis was unreasonable under the Fourth Amendment. In determining whether the degree of force used to effect a particular seizure is "reasonable"

under the Fourth Amendment, the Court must consider all the circumstances and balance the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor,* —— U.S. ——, ——, 109 S.Ct. 1865, 1866, 104 L.Ed.2d 443, 445 (1989) (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985)). A number of factors must be considered during this balancing process including the facts of the particular case, the severity of the crime at issue, whether the suspect poses a threat to the safety of the officer or others, and whether the suspect is resisting arrest or attempting to flee. *Id.* The test is an objective one, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at —— U.S. at ——, 109 S.Ct. at 1872, 104 L.Ed.2d at 456.

In this case, Agent Buzaitis' use of force was objectively unreasonable. He had no justification for detaining Joe Manuel Solis in the first place, and even less justification to use force in accomplishing that detention. The crime at issue—illegal presence in this country—is not particularly serious and is not one which generally involves violence. There is no indication that Joe Manuel Solis posed a threat to anyone, nor is there any evidence on the record that he actively resisted Agent Buzaitis' demands. Assuming there was some reasonable suspicion on which to base a proper detention, it might be appropriate for Agent Buzaitis to restrain Joe Manuel Solis from getting into the truck. But to grab him forcibly, as I find he did, to force him to walk to the patrol car, and to push or shove him against the car, as I find he did, was unnecessary and unreasonable.

*Compensatory Damages*

■ Having concluded that the defendant violated the plaintiffs' Fourth Amendment rights by unreasonably seizing them, and in the case of Joe Manuel Solis by using excessive force to effectuate that seizure, I find that each plaintiff is entitled

to an award of damages. The measure of damages in a *Bivens* action is governed by the common law of torts and plaintiffs are entitled to compensatory damages which include, "not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.' " *Memphis Community School District v. Stachura,* 477 U.S. 299, 307, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (quoting *Gertz v. Robert Welch Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)).

 As I indicated above, I find that the damages are relatively slight, since no plaintiff suffered permanent physical injuries, and since the mental and emotional distress the plaintiffs suffered appears to me to have dissipated shortly after the incident. Clearly, Joe Manuel Solis is entitled to the largest award. He suffered a physical assault and some physical injury. There is also evidence that he suffered a great deal of fright and had nightmares concerning the incident. In light of these facts, I find that Joe Manuel Solis is entitled to compensatory damages in the amount of $1,500.00. Alfredo Solis III also suffered fear and embarrassment. I find that he is entitled to compensatory damages in the amount of $1,000.00. Alfredo Solis Jr. suffered fear and outrage. I find that he is entitled to compensatory damages in the amount of $500.00.

### Punitive Damages

 Punitive damages are available for a deprivation of constitutional rights when, "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). *See also Gutzwiller v. Fenik,* 860 F.2d 1317, 1329 (6th Cir.1988). Although the record is clear that Agent Buzaitis misunderstood the legal standard governing his authority to detain individuals, there is no evidence that he acted with an evil motive or that he was recklessly or callously indif-

ferent to the constitutional rights of others. Rather, the evidence shows only that he misunderstood the applicable law in this area and that he overestimated the degree of force necessary under the circumstances. His actions, while violative of the plaintiffs' constitutional rights and indicative of a disturbing tendency to equate migrant farmworker status with illegal alienage, do not indicate a callous indifference to the plaintiffs' constitutional rights. I find, therefore, that punitive damages are not appropriate.

### Conclusion

I conclude that the defendant's actions on October 4, 1981 violated each of the plaintiffs' Fourth Amendment right to be free from unreasonable seizures of their persons, and I order the defendant to pay plaintiffs compensatory damages in the amounts specified. This has not been an easy decision to reach. Plaintiffs obviously embellished their accounts of this incident, and the defendant's unlawful actions were clearly taken in good faith. But the defendant's subjective impressions and subjective good faith are irrelevant in determining whether a constitutional violation has occurred, and the plaintiffs' attempts to exaggerate their injuries were more the product of their justifiable outrage at the defendant's conduct than of any attempt to mislead this Court.

The most disturbing aspect of this litigation is the undisputed fact that on October 4, 1981, three American citizens were required to justify their presence in their own homeland simply because they are of Hispanic descent and happened to have been employed as migrant farmworkers. The voluminous record in this case clearly indicates that during the early 1980's far too many Hispanic Americans and lawful resident aliens shared the Solis family's unhappy experience. For those of us whose appearance would be unlikely to attract the attention of immigration authorities, it is difficult to imagine the sense of outrage the Solis family, and those who shared their experience, must have felt when they were unreasonably called upon to doc-

ument their citizenship. We take it for granted that we have a right to be present in our own country, and feel secure in the expectation that no one will inquire into our immigration status while we are engaged in an innocuous activity like using a public phone or driving a car in a rural area. Most of us would share the Solis family's clear outrage if these expectations were dashed by an unreasonable intrusion into our privacy.

Although it is unfortunate that plaintiffs were required to participate in this long and difficult litigation in order to vindicate their constitutional right to be left alone, it is clear that this litigation has produced some positive results. We can hope that this verdict will help to erase some of the palpable bitterness displayed by the Solis family at trial, and that it will help to insure that others will not undergo similar violations of their constitutional rights. We can also hope that the defendant and his colleagues, who perform a difficult and necessary public service, will view this litigation not as an attempt to persecute them personally, but as an attempt to clarify and protect the rights of American citizens and lawful resident aliens whose appearance and employment have, for far too long, rendered them unusually susceptible to violations of their constitutional rights. If this litigation has served to inform members of the Border Patrol and the Immigration and Naturalization Service of the limitations placed upon their authority by the Constitution, as I believe it has, then it has performed a valuable public service.

### JUDGMENT

In accordance with the opinion entered this 7th day of August, 1989;

IT IS HEREBY ORDERED that JUDGMENT be entered IN FAVOR of PLAINTIFFS Alfredo Solis Jr., Alfredo Solis III, and Joe Manuel Solis, and AGAINST DEFENDANT Jerry L. Buzaitis;

IT IS FURTHER ORDERED that Defendant Buzaitis shall pay compensatory damages to Plaintiff Alfredo Solis Jr. in the amount of $500.00; to Plaintiff Alfredo Solis III in the amount of $1,000.00; and to

Plaintiff Joe Manuel Solis in the amount of $1,500.00.