**Ronald PREAST, Plaintiff,**

v.

**Brian McGILL & John Gainer, Defendants.**

**No. CIV. A. 2:98–1089.**

United States District Court, S.D. West Virginia, at Charleston.

Sept. 10, 1999.

Lisa A. Moncey, Campbell & Torkaly, Charleston, WV, for plaintiff.

Lisa Curry, Asst. U.S. Attorney, for defendant.

## *ORDER*

HALLANAN, Senior District Judge.

Currently pending before the Court are Defendants United States Deputy Marshal John Gainer's ("Deputy Gainer") and United States Deputy Marshal Brian McGill's ("Deputy McGill") Motions to Dismiss or Alternatively for Summary Judgment which were filed separately and based upon separate grounds. Plaintiff, Ronald Preast filed a Response to Defendant McGill's Motion to Dismiss. However, it appears to the Court that Plaintiff's Response should be a response to Deputy *Gainer's* Motion to Dismiss and not Deputy McGill's as the grounds set forth therein respond only to Deputy Gainer's Motion. Preast has not addressed the issues advanced by Deputy McGill's Motion to Dismiss. Having reviewed said motions, as well as all memoranda and supplemental

memoranda both in support and opposition, as well as all relevant case law, the Court is now prepared to issue its ruling.

Ronald Preast filed a *Bivens*[1] action in the District Court seeking damages while alleging that Deputy McGill and Deputy Gainer violated his constitutional rights on November 5, 1996, by using excessive force, causing bodily harm, falsely arresting and illegally incarcerating him, and finally, misleading a Magistrate Judge by filing fraudulent affidavits in support of Preast's arrest.

## I. BACKGROUND

### A. *Plaintiff Preast's Account of Events on November 5, 1996*

On November 5, 1996, Preast appeared, *pro se*, at the former United States District Courthouse, for the Southern District of West Virginia, located in Charleston, for a hearing before the Honorable Chief Judge Charles Haden. At the conclusion of said hearing, Preast proceeded to the Clerk's office and sat in a public area while talking on a telephone. Preast alleges that he was not interfering with the operation of said office, nor obstructing access, or the normal business activities. *Compl.* at 3. Preast next alleges that Deputy McGill and Deputy Gainer proceeded to the Clerk's office where they instructed Preast to leave the federal building. *Id.* Plaintiff contends that when the deputies arrived they "jerked" the phone out of his hand, was grabbed by both arms, " 'carried' down the hallway, slammed against the wall, thrown into the elevator, and slammed against the elevator wall (both face first)." *Id.* Preast states that he indicated to the deputies that he did not wish to leave the Clerk's office, that he was in a public area and that he had done nothing wrong. *Id.* at 4. Despite Preast's plea,

however, he contends that he was forcibly escorted to the front of the building where a television news crew happened to be videotaping the entrance of said building. The news crew caught the entire event on video.

In his Complaint, Preast next advances that he turned around and began to reenter the building while placing his hands into his pockets. According to Preast, when he reentered the building, he was grabbed by the deputies, beaten and wrestled to the floor. *Id.* Preast was arrested and subsequently charged with violating Title 18, United States Code, Section 111 (forcibly resisting, opposing, or impeding a U.S. Marshal who was engaged in the performance of his duties), and 41 C.F.R. § 101–20.305 (engaging in disorderly conduct and creating a nuisance).[2]

After said arrest and overnight incarceration, Preast states that the deputies submitted an affidavit to United States Magistrate Judge, Jerry Hogg, in support of the criminal Complaint against him.[3] Preast alleges that the sworn affidavits given by the deputies are fraudulent in that said deputies' "falsely and deliberately testified that Preast charged at them, pushed them and tried to get past them." *Id.* at 4. Preast further contends that the deputies "falsely and deliberately stated that Preast wrestled the deputies to the ground." *Id.* As a result of said deputies alleged wrongs as set forth herein, Preast was incarcerated for one day, subjected to an indictment on felony charges, forced to undergo psychiatric testing and evaluation, and placed on probation two different times. *Id.* Therefore, Preast claims that he has been irreparably harmed as a result of the "deprivation of his constitutional rights," and further, Preast claims that "such harm can

---

1. In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the plaintiff sought and recovered damages against federal employees for violation of his constitutional rights.

2. The criminal Complaint was subsequently dismissed on December 5, 1996, after Preast successfully completed a Pretrial Diversion Program.

3. After reviewing the court file, it is clear that Deputy Gainer did not file an affidavit in this matter, rather Deputy McGill did.

only be redressed by the judicial system and an award of monetary damages." *Id.* The deputies account of the aforementioned events are very different, however.

### B. Defendants' Deputy Gainer and Deputy McGill's Accounts of Events on November 5, 1996

It is not disputed that on November 5, 1996, Preast attended a hearing in front of the Honorable Chief Judge Haden, however, that is about the only factual piece of information that the parties agree upon. According to Deputy Gainer, on said date, he was notified that Judge Haden had called the U.S. Marshals Service to report that a hearing had occurred that morning during which Preast had become very upset. *Def. Mot. Dismiss Ex. G* at 1 (Gainer Decl.) Judge Haden requested that the Marshals Service advise the Court Security Officers of the situation. *Id.* A few minutes later, Deputy Gainer was notified that Preast was sitting in the Clerk's office. Further, both deputies state that according to Deputy Clerk Nora Sims, Preast stated that he was going to sit in the Clerk's office until Judge Haden restored his rights.[4] (Gainer Decl. at 1); *see Def. McGill's Mot. Dismiss Ex. A* at 1 (Aff.McGill).

According to Deputy McGill and Deputy Gainer, they approached Preast as he was talking on the phone in the hallway.[5] The deputies then advised Preast that he would have to leave the building, at which point, "Preast became loud, belligerent and demanded that he be allowed to stay." (Gainer Decl. at 2); (Aff. McGill at 1). Preast allegedly continued his rant by stating that, "he was there for his trial and would not leave until Judge Haden restored his rights." (Aff. McGill at 1).

Because of Preast's explosive behavior towards the deputies, according to Deputy Gainer and Deputy McGill, they took Preast by the arm to escort him from the building. Deputy Gainer states that Preast was "visibly upset and his tone was excited and combative." (Gainer Decl. at 2). Deputy McGill states that when they escorted Preast from the building, Preast resisted their efforts and "screamed at [them]." (Aff. McGill at 2). Prior to escorting Preast from the Courthouse, however, the deputies advised Preast to get an attorney before he attempted to return, wherein Preast allegedly replied that "attorneys were the problem." (Gainer Decl. at 2).

After Preast was escorted through the front of the Courthouse, the deputies remained just inside the front doors waiting to see if Preast would leave. However, as Preast exited the building he noticed a television news cameraman. According to Deputy Gainer, the presence of the cameraman "appeared to fuel Preast's agitation." (Gainer Decl. at 2–3). Preast then turned and ran back toward the building,

---

4. Ronald Preast is no stranger to the court system indeed, having filed multiple lawsuits against IBM Corporation ("IBM"), both in state and federal court. In fact, Preast had filed a total of six lawsuits against IBM between 1987 and 1996, which included three filed in the Southern District of West Virginia alone. *Def. Gainer's Mot. Dismiss Ex. F* at 2–6. Preast had been ordered twice not to file any further actions against IBM, first by the Honorable Judge John T. Copenhaver on June 12, 1995, and again on October 7, 1996, by Judge Haden. *Id.* Ex. A & E at 1. All six suits brought by Preast were dismissed, five of which were based upon the grounds of *res judicata*. Because of Preast's fixation on suing IBM and his vexatious nature towards the court, Chief Judge Haden tersely instructed Preast with the following dialogue:

> [Y]ou have had your final days in court and I have enjoined you, that is issued an order prohibiting you from filing any other action in this court or in the state courts of West Virginia. And I just want you to understand that you are at a point with the entire court system where if you take any action in disregard of the court's order, you will be held in contempt of the court's order. And this is a serious thing, and I just wanted you to know that what is in that order is not to be trifled with.

*Def. Gainer's Mot. Dismiss Ex. C* at 3.

5. Deputy Gainer was also notified that Chief Judge Haden, in a hearing earlier in the day, had ordered Preast not to file any further law suits against IBM. (Gainer Decl. at 2).

grabbed the front door, threw it open using some force, and began to shout, *inter alia*, for the deputies to come outside onto the sidewalk. *Id.* at 3. Ignoring Preast's taunts, Deputy Gainer contends that he advised Preast if he came back into the building he would be placed under arrest. *Id.* Despite the warnings, however, Preast reentered the Courthouse at which time Deputy Gainer grabbed Preast by the arm. *Id.* Both deputies contend that Preast began to struggle and tried to pull away. *Id.*; (Aff. McGill at 3). A brief struggle ensued, where according to the deputies, Preast was able to pull both of them to the floor. After said struggle, the deputies were able to contain Preast and place him in handcuffs and then transport him to the cellblock located in the U.S. Marshals Service office.

Preast appeared at a detention hearing before Magistrate Judge, Jerry D. Hogg on November 6, 1996. *Def. Gainer's Mot. Dismiss Ex. I.* Preast asked to make a statement to the court. Preast did not make mention to the Judge that the deputies used excessive force during his arrest nor did he complain of any physical injuries as a result thereof. *Id.* However, Preast did apologize to the court, Judge Haden, and the deputies, stating that he had become obsessed with his case against IBM. *Id.* at 5. Preast specifically stated, however, "What I did yesterday evening was wrong." *Id.* at 6. Preast, who was represented by counsel in the criminal matter entered into a Pretrial Diversion Agreement. *Def. Gainer's Mot. Dismiss Ex. B.* In said Agreement, Preast specifically "accept[ed] responsibility" for his behavior on November 5, 1996. *Id.* at 1. After the successful completion of the Diversion Program, the criminal Complaint against Preast was dropped.

### C.   The Video of Events on November 5, 1996

Normally, in a case where individuals present different accounts of the same event, the Court is charged with the difficult assignment of determining which individuals are telling the truth. Had it not been for the video detailing the account of the encounter between Preast and said deputies, the Court would have had a much more difficult time rendering a decision. Fortunately, the video has provided the Court with a different lens to view the events that took place on said date.

The video provides a much different account of events than Preast has advanced to the Court. The video begins with a picture of the seal from the former United States District Courthouse. That picture runs approximately fifteen seconds. Unfortunately, there is no sound to the entire video. The video then breaks to the action scene of Preast abruptly turning away from the cameraman and hastily walking back to the entrance of the Courthouse in what appears to be a defiant manner. Once Preast reaches the glass door of the Courthouse, he grabs said door with his right hand and throws it open using some force.

At that point, Preast stands just outside the entrance of the Courthouse holding the glass door open with his right hand while furiously gesturing with his left thumb in what appears to the Court to be a challenge for the deputies to step outside. Preast did this several times. During his gesturing, it is very apparent through the video, that Preast was extremely angry and upset, and at no time up to this point were Preast's hands in his pockets as he contends. Once Preast finished his infuriated gesturing with his thumb, he stepped clear of the doorway as if to let the deputies walk outside. Preast then began to hostilely point at the deputies using his left index finger and then pointing said finger at the ground where he was standing. Again, as if to challenge the deputies to step outside. Preast points at the deputies with his index finger no less than four times and continues to do so for about five seconds. It is apparent to the Court from viewing the video that Preast was extremely agitated, and it is clear that he was yelling the entire time.

It further appears that once Preast noticed that the deputies were not going to accept his challenge of stepping outside, Preast steps back into the crest of the doorway, and begins to recalcitrantly walk through it. Once Preast breaches the opening of the doorway and the door closes behind him, he places his hands in his pockets in such a cocky manner that it appears to the Court that Preast was defiantly testing the deputies orders to not reenter the Courthouse. As soon as Preast placed his hands in his pockets, the video shows the deputies approach Preast. Preast then takes his hands out of his pockets and attempts to flee the deputies by exiting the same door he had entered through. The deputies, however, were able to grab Preast before he could flee.

The view of the next set of events, about three to four seconds worth, are blocked by a wall that the parties move behind while the deputies attempt to arrest Preast. The next thing the video displays are the parties falling to the Courthouse floor behind another glass door. It appears that Preast is on the bottom, lying down face first. The deputies then tried to place Preast's left hand behind his back in an attempt to place him in handcuffs, but it is clear from viewing the video that Preast was offering resistance. It took the two deputies approximately five to eight seconds to place Preast in handcuffs. Once the deputies accomplished this task they helped Preast up and escorted him away. It does not appear to the Court from viewing the video, however, that Preast was treated in a rough and tumble manner while detained on the ground or when he was subsequently taken away. After that point, the video turns off. In all, the video runs approximately one minute and twenty seconds, approximately fifteen seconds of which is the view of the seal on the outside of the Courthouse.

The facts of this case, however, do not end there. Preast filed this action with the Court on November 5, 1998, and Summonses for the two Defendants, were issued the same day. *Def. McGill's Mot. Dismiss Ex. A* at 1. A review of the docket sheet shows that a Return of Service for Deputy McGill was filed on March 17, 1999. *Id.* Additionally, the Return of Service reflects that Deputy McGill was personally served on March 5, 1999, by process server, Joe Meadows, at the U.S. Courthouse in Charleston, West Virginia. *Def. McGill's Mot. Dismiss Ex. B* at 1. Moreover, the docket sheet indicates that while a Summons was also issued for Deputy Gainer on November 5, 1999, no Return of Service has been filed.[6] *Id.* at Ex. A.

Deputy McGill contends, however, that despite the Return of Service reflecting that he was served, he denies that he was in fact served a copy of the Summons and Complaint on March 5, 1999, or any other date. *Def. McGill's Mot. Dismiss Ex. C.* In Fact, Deputy McGill states that he was not in Charleston, West Virginia, on the date said Service of Process reflects. *Id.* Furthermore, while there is no Return of Service filed with the Court for Deputy Gainer, he states that he was in fact served with a copy of the Summons and Complaint on March 5, 1999, while present at the U.S. Courthouse in Charleston, West Virginia. *Def. McGill's Mot. Dismiss Ex. D.*

Having considered the merits of this case, the arguments of both parties, the alleged Service of Process defects concerning Deputy McGill, and the various legal arguments advanced by Deputy Gainer, the Court hereby finds that Deputy McGill is not an actual party to this suit as he has not been properly served, and further this action against Deputy Gainer warrants dismissal based upon various legal grounds. The Court will first address the service of process defect concerning Deputy McGill and will then move to the legal arguments advanced by Deputy Gainer.

---

**6.** Deputy Gainer admits he was served on March 5, 1999, at the Courthouse, however no Return of Service was ever filed to that effect. *See Def. McGill's Mot. Dismiss Ex A.*

## II. Defendant McGill's Motion to Dismiss

■■■■ Preast's Complaint makes clear that he is suing Deputy McGill in his individual capacity under a *Bivens* theory, rather than as an employee of the U.S. Marshals Service. Therefore, to the extent that Preast seeks to hold Deputy McGill liable for damages under a *Bivens* theory he must effectuate a proper service. In a *Bivens* suit against a federal official for money damages, individual and institutional service of process is required. *Stafford v. Briggs*, 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1 (1980). As advanced by Deputy McGill, in the absence of personal jurisdiction over an individual, the Court is powerless to enter a judgment binding that individual. Thus, before a Court may exercise personal jurisdiction over an individual named in a suit, there must have been proper service of process. *Moni Capital International v. Rudolf Wolff & Co.*, 484 U.S. 97, 102, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987). Additionally, Rule 4 of the Federal Rules of Civil Procedure governs service of process upon parties in civil actions.

Rule 4(m) requires that service be perfected within 120 days from the issuance of the summons. FED. R. CIV. P. 4(m). If the summons is not perfected within that time frame, the Court "shall dismiss the action without prejudice as to that defendant" or may extend the time for service "if the plaintiff shows good cause for the failure." *Id.* The Summonses in this case were issued on November 5, 1998. Therefore, 120 days which Rule 4(m) allows for service expired on March 5, 1999, unless Preast advances good cause for his failure to do so.

In the case at bar, Deputy McGill contends, and the Court agrees, that Preast failed to effectuate proper service upon him by March 5, 1999. Deputy McGill's affidavit and Deputy Gainer's Declaration both state that Deputy McGill was not personally served a copy of the Summons and Complaint. In fact, Deputy McGill maintains that he was not in the state of West Virginia on March 5, 1999, or March 17, 1999, respectively, the dates which the Clerk's docket sheet reflects that a Summons was issued and subsequently filed for Deputy McGill. This is not disputed by Preast. Further, the evidence before the Court shows that process server, Joe Meadows, served Deputy Gainer rather than Deputy McGill with the Summons and Complaint on March 5, 1999, at the U.S. Courthouse in Charleston, West Virginia. *Def. McGill's Mot. Dismiss Ex. A.* Deputy Gainer states that he was served on the day, and in the manner reflected on the Return of Service filed for Deputy McGill. *Def. McGill's Mot. Dismiss Ex D.*

Since Deputy McGill has not been properly served with the Summons and Complaint within the requisite time period, the Complaint must be dismissed as it relates to him because the Court does not have jurisdiction to enter a judgment against him. Additionally, not only does Preast not refute the lack of service upon Deputy McGill, he also has not advanced to the Court the existence of good cause for his failure to serve him.[7] Wherefore, as Preast has failed to perfect service upon Deputy McGill in accordance with Rule 4, the Court lacks personal jurisdiction over him, and therefore, Preast's Complaint as to Deputy McGill is dismissed without prejudice.

## III. Defendant Gainer's Motion to Dismiss

■■■■ First, Deputy Gainer contends that Preast's Complaint fails to specifically plead a constitutional violation, and therefore, fails to state a claim upon which relief can be granted pursuant to Rule 12(b)(6)

---

**7.** In *T&S Rentals v. United States*, 164 F.R.D. 422, 425 (N.D.W.VA.1996), the court indicated that "good cause" may exist where plaintiff can show the delay in service was attributable to external factors that would reasonably stifle a plaintiff's due diligence, as opposed to plain attorney error. Preast has proffered no facts in the case at bar which would support such a finding.

of the Federal Rules of Civil Procedure. The Court does not agree. It is well settled law that a plaintiff can sue federal officers individually for damages caused by constitutional torts committed under color of their authority. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). However, complaints in civil rights cases, such as the one currently before the Court, require a higher standard of pleading. *Randall v. United States,* 95 F.3d 339 (4th Cir.1996); *see Dunbar Corp. v. Lindsey,* 905 F.2d 754, 764 (4th Cir.1990) (holding that a "'heightened pleading standard' is highly appropriate in actions against government officials"). Additionally, a complaint can survive a motion to dismiss only if it "... alleges the specific conduct violating the plaintiff's right, the time and the place of that conduct, and the identity of the 'responsible officials.'" *Colburn v. Upper Darby Township,* 838 F.2d 663 (3rd Cir. 1988) *cert. denied* 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 808 (1989).

Deputy Gainer contends that Preast's Complaint must fail because it does not meet the heightened specificity standard for a civil rights complaint against government officials. Specifically, Deputy Gainer alleges that the Complaint fails to identify with specificity who subjected Preast to excessive force and a false arrest. Further, Deputy Gainer advances that the Complaint fails to provide any basis for how the alleged actions amounted to unreasonable force given that Preast adamantly refused to leave the building when the deputies requested him to do so, and further, when Preast resisted their efforts to remove him. Finally, Deputy Gainer proffers that the Complaint must fail as Preast complains of no specific physical injury he suffered as a result of Deputy Gainer's alleged actions.

■ The Court finds that Preast's Complaint does in fact meet the heightened specificity requirement. Preast states that on or about November 5, 1996, he was present in a hearing before Chief Judge Haden. *Compl.* at 3. He further states that after said hearing he was present in the Clerk's office talking on the telephone when the deputies, listed as Defendants in this case, approached him and took him from the building. Although the specific factual allegations of the parties are different, the chain of underlying events are the same. Preast states that he had the telephone "jerked out of his hand" and was "grabbed by both arms, 'carried' down the hallway, slammed against the wall, thrown into the elevator," and finally, "slammed against the elevator wall (both face first)." *Id.*

Preast goes on to claim that after he was "forcibly escorted" from the building, and as he tried to reenter, he was "grabbed by the defendants, beaten and wrestled to the floor." *Id.* Preast correctly identifies the deputies involved. Additionally, Preast makes a claim for personal injuries, impairment of reputation, personal humiliation, and mental anguish and suffering, all allegedly suffered at the hands of Deputy Gainer. *Compl.* at 4.[8] Finally, as argued by Preast, the video provides an account of said events, identifies the deputies involved, and although the Court does not necessarily agree with Preast's version of facts after viewing the video, the Court does agree that he has advanced enough factual allegations at this point to survive Deputy Gainer's initial argument that the Complaint fails to state a claim for which relief can be granted. This defense, however, is certainly not Deputy Gainer's strongest point of attack. As further advanced by Deputy Gainer, Preast's Complaint must be dismissed on the grounds of qualified immunity.

---

**8.** In *Ramirez v. Webb,* 719 F.Supp. 610 (W.D.Mich.1989), the court held that compensatory damages in a *Bivens* action include not only out-of-pocket expenses, but intangible injuries as well, such as, impairment of reputation, personal humiliation, and mental anguish and suffering.

It is clear that a complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Additionally, questions of qualified immunity *should not* be placed in the hands of a jury, *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (emphasis added), rather, "[i]mmunity ordinarily should be decided by the court long before trial." *Hunter,* 502 U.S. at 228, 112 S.Ct. 534. Further, the Supreme Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Id.* at 227, 112 S.Ct. 534. Although the Court has found that Preast has advanced sufficient facts to survive the heightened specificity standard for complaints in a civil rights case, Deputy Gainer is entitled to a dismissal of this suit based upon the doctrine of qualified immunity.

The Fourth Circuit Court of Appeals has stated that, "[i]t is a well settled proposition that government officials performing *discretionary functions* are entitled to qualified immunity from liability for civil damages to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *S.P. v. City of Takoma Park et al.,* 134 F.3d 260, 265 (4th Cir.1998) citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Additionally, "[w]hen determining whether law enforcement officers are entitled to qualified immunity, the Court must (1) identify the right allegedly violated, (2) determine whether the constitutional right violated was clearly established at the time of the incident, and (3) evaluate whether a reasonable [official] would have understood that the conduct at issue violated the clear-

ly established right." *Id.; see Smith v. Reddy,* 101 F.3d 351, 355 (4th Cir.1996) (holding that "[i]f the right was not clearly established at the relevant time or if a reasonable officer might not have known that his or her conduct violated that right, the officer is entitled to immunity"). Deputy Gainer assumes, *arguendo,* that the first two elements are established, however, Deputy Gainer further states that the critical question is whether he knew that his actions in removing Preast from the Courthouse and then later placing him under arrest violated a specifically identified right.[9]

The right relied upon by Preast in this case is certainly a clearly established right: the right not to be subjected to unreasonable seizures established by the Fourth Amendment of the United States Constitution. Thus the true questions are whether a reasonable official in Deputy Gainer's place would have understood that this conduct violated that right and whether Deputy Gainer's conduct violated that right.

The Supreme Court of the United States determined the appropriate constitutional standard governing a plaintiff's claim that a law enforcement officer used excessive force in either an arrest, investigatory stop or any other "seizure" of his person. *Graham v. Conner,* 490 U.S. 386, 388, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The *Graham* Court held that the "reasonableness" inquiry in an excessive force case is an objective one. *Graham,* 490 U.S. at 397, 109 S.Ct. 1865. "[T]he question is whether the [official's] actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

The *Graham* Court elucidated that a determination of reasonableness "requires careful attention to the facts and

---

9. The United States Supreme Court has stated that qualified immunity, "protects all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865. Finally, the " 'reasonableness' " of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the $^{20}\!/_{20}$ vision of hindsight." *Id.* at 397, 109 S.Ct. 1865. Here, several factors suggest that Deputy Gainer's use of force was not so excessive that no reasonable officer could have believed in the lawfulness of his actions.

The U.S. Marshals Service is charged with the great responsibility of protecting the Court and the Judges who preside therein, as well as insuring the security of the Courthouse. Deputy Gainer's actions in removing Preast from the Courthouse were more than reasonable given Preast's adamant refusal to leave the Clerk's office until Judge Haden had restored his civil rights. After Preast refused to leave the Courthouse, Deputy Gainer had no choice but to escort him from the building.

Similarly, Deputy Gainer's actions in arresting Preast were reasonable in light of Preast's contemptuous behavior reflected on the video. Preast appeared to be in a rage after being escorted out by the deputies. He defiantly stood just outside the Courthouse door ranting and raving while a cameraman taped his every move. It is apparent to the Court that he challenged the deputies to step outside by his continuous pointing at the deputies and then pointing at the ground next to him. Preast's arms were flailing in such a hostile manner that any reasonable officer in the same situation would have felt threatened standing next to him. Additionally, although there is no sound to the video, it is more than clear that Preast was yelling the entire time. Allowing Preast to return to the Courthouse in such a state of mind or condition was not an alternative for the deputies.

The deputies had warned Preast not to reenter the Courthouse, but Preast disregarded this order. In fact, Preast had a long history of ignoring court orders, was in the very process of ignoring Judge Haden's order from that morning and ignored Deputy Gainer's warning that he would be arrested if he reentered the Courthouse. Preast challenged the deputies by walking back into the Courthouse, at which time the deputies moved quickly towards him to effectuate his arrest. Preast then turned to flee. Preast was not arrested quietly, however. It is clear from the video that a subsequent struggle ensued in which Preast was resisting arrest for a brief amount of time.

Deputy Gainer is correct to state that summary judgment is appropriate in cases such as this where no reasonable trier of fact could conclude that Deputy Gainer acted unreasonable in his dealing with Preast. In *Drewitt v. Pratt,* 999 F.2d 774 (4th Cir.1993) (Hallanan, J. sitting by designation), *cert. denied,* 512 U.S. 1204, 114 S.Ct. 2672, 129 L.Ed.2d 808 (1994), the Fourth Circuit affirmed the District Court's summary judgment holding which found defendant officer's actions were not unreasonable and therefore, the officer was entitled to qualified immunity.

In *Drewitt,* Officer Pratt was an armed plain clothed, off-duty, police officer working as a part-time security officer at Pizza Hut. When Officer Pratt noticed an errant and reckless driver collide with a parked pick-up truck and then begin to pull away, Officer Pratt announced to Drewitt that he was a police office and ordered the errant driver to stop. *Drewitt,* 999 F.2d at 774. Drewitt failed to do so, but instead attempted to flee in the direction in which Officer Pratt was standing. *Id.* Officer Pratt yelled several more times that he was a police officer, but failed to display his badge. *Id.* The reckless vehicle sped towards Officer Pratt at which time, Officer Pratt positioned himself in a manner not to be dragged under the car. *Id.* After impact, Officer Pratt remained on the

hood, withdrew his service revolver, and fired two shots into the vehicle while at the same time rolling off the moving car. *Id.*

The *Drewitt* court held that the failure of Officer Pratt to display his badge when announcing himself as a police officer and demanding Drewitt to stop his vehicle was irrelevant to the issue of "whether at the moment of the shooting Officer Pratt had probable cause to believe that Drewitt posed a threat of death or serious bodily harm to him." *Id.* at 780. The court balanced the surrounding circumstances faced by Officer Pratt and concluded that he was entitled to qualified immunity. *Id.*

Further, in a case very similar to the one currently before the Court, *Wardlaw v. Pickett*, 1 F.3d 1297 (D.C.Cir.1993), the court affirmed summary judgment for defendant, finding that defendant Deputy Marshals' use of force against the arrestee was not so excessive that no reasonable officer could not have believed its lawfulness for the purposes of qualified immunity. In *Wardlaw*, Deputy Marshals removed a disorderly man from the courtroom. *Wardlaw*, 1 F.3d at 1300. That man was a friend of Wardlaw. The deputies escorted the disruptive man from the courtroom to the stairwell that exited the building in an attempt to remove the disruptive man from the courthouse. *Id.* Wardlaw, witnessing the aforementioned events, rushed down the stairwell towards the deputies shouting, "Don't hurt him please. He is totally nonviolent." *Id.* Upon hearing the yelling, one of the Deputy Marshals spun around and punched the approaching Wardlaw once in the jaw and two or three times in the chest. *Id.* Wardlaw was subsequently arrested for assault, but was later acquitted. Additionally, Wardlaw refused medical treatment for his injuries after the scuffle, but maintained that he experienced substantial pain in his chest and jaw over the next several months. *Id.*

Wardlaw brought a *Bivens* action against the Marshal who hit him asserting, *inter alia*, that the force used by said Marshal was excessive and caused injuries.

*Id.* at 1304. In finding qualified immunity for the Deputy Marshal, the *Wardlaw* court balanced the rationale discussed above and held that law enforcement officers "must be free to use the reasonable force necessary to effect an arrest. Giving the privilege too broad a scope might easily deter officers from using force when it is necessary and justified." *Id.*

Again, the facts of *Wardlaw* are very similar to this case. In *Wardlaw*, the Deputy Marshals who removed a disorderly man from the courthouse were later sued for Fourth Amendment violations. In this case, Preast was escorted from the Courthouse after declaring in the Clerk's office that he would not leave until Judge Haden had restored his rights. Further, Preast admitted at his detention hearing that he had become obsessed with his court case and that he had been trying to be heard. *Def. Gainer's Mot. Dismiss Ex. I* at 5 (Pl.'s Detention Hr'g Tr.). Additionally, Preast stated that, "[He] was very angry [that day], and [he] also only had about three hours of sleep the night before because of the pressure [he] was under." *Id.* "So all those things coupled together really upset [him]." *Id.* Further, Preast told Magistrate Hogg that, "What [he] did yesterday was wrong," and that "when [he] left the courthouse afterwards ... [he] was so shook up and so nervous [he] couldn't even hold a cup of water, the adrenaline rush was so great." *Id.* Finally, in apologizing to the court, Preast declared that, "[he] was just so *full of anger* and [that anger] ... had turned into *rage*." *Id.* at 7 (emphasis added). Preast did not make any complaint of injuries to Magistrate Hogg or anyone else.

Preast's admissions, taken together with the facts of this case, including the undisputed facts from the video, and analogous case law, well support a finding that Deputy Gainer acted reasonably in escorting Preast from the Courthouse and arresting him when he returned. The Court finds that no reasonable trier of fact could conclude otherwise.

The Court may also consider the degree of harm caused by the application of force in determining whether the use of force was reasonable or excessive. *Drake v. Higgins,* 1999 WL 462987 *5 (W.D.Va.1999). Preast contends that as a direct and proximate result of Deputy Gainer's alleged constitutional violations, he suffered personal injuries, "impairment of reputation, personal humiliation, mental anguish and suffering." *Compl.* at 5. Generally, it has been held that a significant visible injury is required to support an excessive force claim. *Gaudreault v. Municipality of Salem,* 923 F.2d 203, 206 (1st Cir.1990). However, at least one District Court has held that the "lack of significant injures immediately after the incident belie [Preast's] ·claims," *Drake,* 1999 WL at 462987, *5, and that anything more than what he suffered at the hands of Deputy Gainer amounted to nothing more than the infliction of insignificant injuries caused during the course of a reasonable arrest.

There are, however, some circumstances where an injury may manifest itself after an incident, even though there are no serious visible injuries. *Drake,* 1999 WL 462987, at *5; *see, e.g., Rowland v. Perry,* 41 F.3d 167, 174 (4th Cir.1994) (denying summary judgment where plaintiff limped away from a skirmish with police and doctors later discovered that ligaments in his right leg had been torn). However, similar to the matter at hand, where a plaintiff can point to no evidence of a visible injury "at the time of ·the incident and can point to no medical evidence of serious lasting injuries caused by any alleged use of force, a plaintiff's unsubstantiated claims of permanent injury are entitled to little weight." *Drake,* 1999 WL 462987, *5; *see Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990) (holding that claims of nerve damage and pain, without medical records establishing long-term injury, insufficient to demonstrate use of excessive force). When a "plaintiff's claims of serious injury are entitled to little weight, so are his claims of excessive force." *Drake,* 1999 WL 462987, *5 citing *Cooper v. City of Virginia Beach,* 817 F.Supp. 1310 (E.D.Va.· 1993) *aff'd,* 21 F.3d 421 (4th Cir.1994) (holding that a "lasting or serious injury" must be proven to escape summary judgment in a excessive force case).

Preast has advanced no evidence of any serious injury, and therefore, the lack of said evidence belies his claim that Deputy Gainer used more than the amount of force reasonably necessary to restrain and carry him away. Deputy Gainer "reasonably could have believed, given the nature of the scene and the actions of the Plaintiff, that he posed a threat and that the use of force was necessary to arrest him." *Drake,* 1999 WL 462987, *5. Additionally, it was Preast who caused the attention to himself by ranting and raving outside the Courthouse door. Any arrest is certain to bring some form of an impairment of reputation, personal humiliation, and mental anguish or suffering, however, the Supreme Court created a *Bivens* action to award those unlawfully arrested individuals who suffered extreme physical or mental harm at the hands of abusive government officers.

This case is much different, however, than those *Bivens* sought to remedy. In this case, Preast brought upon himself the consequences he eventually faced. The video tells the Court so in detail. Therefore, Preast's allegation of excessive force, again, must fail.

The Court next turns to Preast's claim of false arrest. "In order for qualified immunity to attach, it is not necessary that probable cause for an arrest actually exist. It is necessary only that the officer[s] be objectively reasonable in believing that it is present." *Rowland,* 41 F.3d at 174. Further, the Supreme Court held that an officer retains qualified immunity from suit if he had an objectively reasonable basis for believing that the facts and circumstances surrounding the arrest were sufficient to establish probable cause. *Malloy v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Here, the video's version of events, coupled with Deputy McGill's affidavit and Deputy Gainer's Declaration, supports the conclusion that probable cause to arrest Preast existed on November 5, 1996. The video shows Preast in a state of rage standing just inches outside the Courthouse door, just several feet in front of the Deputy Marshals after being told not to reenter. As Preast was yelling at the deputies and causing attention to himself, his body language was combative and challenging. Preast admits to being in a state of rage and anger at that time, that his adrenaline was rushing, and that his actions on November 5, 1996, were wrong. Accordingly, the Court concludes that the Deputy Gainer had probable cause to arrest Preast.

■ Even if the Court were to conclude that probable cause did not exist, the Court none-the-less finds Deputy Gainer immune from suit. Qualified immunity shields Deputy Gainer "from suits for damages if 'a reasonable officer could have believed [Preast's arrest] to be lawful, in light of clearly established law and the information"' Deputy Gainer possessed at that time. *Hunter*, 502 U.S. at 227, 112 S.Ct. 534 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Deputy Gainer is entitled to qualified immunity even if he "reasonably but mistakenly conclude[d] that probable cause [was] present." *Hunter*, at 227, 112 S.Ct. 534. "Officials who make reasonable errors retain their immunity . . . ." *Wardlaw*, at 1304. "This accommodation for reasonable error exists because 'officials should not err always on the side of caution because they fear being sued.'" *Hunter*, at 229, 112 S.Ct. 534 (quoting *Davis v. Scherer*, 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)). In this situation, an objectively reasonable officer in the same situation would have done as Deputy Gainer did. Thus, even assuming *arguendo*, that Deputy Gainer erred in arresting Preast, Deputy Gainer would none-the-less be entitled to immunity from suit because his decision to arrest Preast was reasonable. *See Wardlaw*, at

1305. Accordingly, Preast's claim of false arrest is without merit.

■ Next, the Court moves to Deputy Gainer's contention that Preast's civil rights claim against him are barred by the doctrine of collateral estoppel. Deputy Gainer asserts that since Preast entered into a Pretrial Diversion Agreement accepting full responsibility for his actions on November 5, 1996, he is now collaterally estopped from bringing suit against him for civil rights damages. Collateral estoppel is premised upon the notion that a judgment in a prior suit "precludes relitigation of issues actually litigated and necessary to the outcome of the first action." *U.S. v. Wight*, 839 F.2d 193, 196 (4th Cir. 1987) (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). Therefore, when an issue is determined in a prior action, and that issue was necessary and essential to the judgment, the parties to a second action are precluded from later raising that issue. *Wight*, 839 F.2d at 196. Similarly, the "doctrine of collateral estoppel may apply to issues litigated in a criminal case which a party seeks to relitigate in a subsequent civil proceeding." *Id.* Therefore, "[i]n some instances, the criminal conviction may be a plea agreement: a defendant is precluded from retrying issues necessary to his plea agreement in a later civil suit." *Id.; see e.g., U.S. v. Di-Bona*, 614 F.Supp. 40 (E.D.Pa.1984) (holding that where a corporation's officers had pled guilty to violating a False Claims Act in an earlier criminal proceeding, said corporation was collaterally estopped from denying liability in a subsequent civil Federal Claims Act suit).

The critical question in this case then, is whether Preast's behavior which led to his arrest was an essential element of the Diversion Agreement that he entered into. In this case, Preast entered into a pretrial diversion program with advice from competent and experienced criminal defense counsel. The Pretrial Diversion Agreement specifically provided that Plaintiff

was accepting responsibility for his actions on November 5, 1996. *Def. Gainer's Reply Pl.'s Resp. Mot. Dismiss Ex. B.* Preast admitted to the charges brought against him by Deputy Gainer. Those charges included; forcibly assault, resist, oppose, impede and interfere with U.S. Marshals while engaged in and on account of the performance of their official duties; and engaging in disorderly conduct and creating a nuisance. Because Preast accepted responsibility for his actions that led to his arrest, and said actions were the essential elements to the development of probable cause that led to said arrest, the Court hereby finds Preast to be collaterally estopped from relitigating issues resolved by his Pretrial Diversion Agreement in this civil suit for damages.[10]

Finally, the Court turns to Preast's allegations that Deputy Gainer submitted a fraudulent affidavit to Magistrate Judge Hogg, in support of the criminal Complaint against him. *Compl.* at 4. Deputy Gainer responds to this allegation by stating that he did not file an affidavit before Magistrate Hogg, rather he only filed a declaration in support of his version of events on November 5, 1996. After reviewing the case file, the Court finds that Deputy Gainer in fact did not file an affidavit, but rather a declaration instead. It was Deputy McGill who filed an affidavit in support of the events that transpired on said November day, and as clearly laid out above, Deputy McGill has been dismissed from this suit.

■ Assuming *arguendo*, however, that Deputy Gainer did file an affidavit in this case, and said affidavit was in fact fraudulent, the outcome of this case would still be the same, as any "purported perjurious statements [made by Deputy Gainer was] not necessary to the finding of probable cause" *Wilkes v. Young,* 28 F.3d 1362, 1364 (4th Cir.1994), for Preast's arrest. In *Wilkes,* the Fourth Circuit refused to find any Fourth Amendment violation in a case where a defendant submitted an allegedly perjurious affidavit in support of an arrest warrant. *Wilkes,* 28 F.3d at 1362. The *Wilkes* court reasoned that because the alleged perjurious statements in the arrest warrant were not the basis for the probable cause to arrest Wilkes, the court found no Fourth Amendment violation. The same principle applies here. The probable cause for Deputy Gainer to arrest Preast came from Preast's deliberate actions in refusing to obey Deputy Gainer's command not to reenter the Courthouse. Moreover, Preast's combative behavior also created probable cause for his arrest. Regardless of whether Deputy Gainer, or Deputy McGill for that matter, later filed a false affidavit in support of Preast's arrest, the probable cause to arrest Preast came prior to any filing of a false affidavit in support of an arrest. *See Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) (holding that a false or misleading statement in a warrant affidavit does not constitute a Fourth Amendment violation unless the statement is "necessary to the finding of probable cause"). Accordingly, the Court hereby finds Preast's argument on this point meritless.

Accordingly, for all the reasons set forth herein, it is this day **ADJUDGED AND ORDERED** that the Defendants' separate Motions to Dismiss shall be, and they hereby are, **GRANTED,** and this case shall be, and it hereby is, dismissed and stricken from the docket of this court.

The Clerk of the Court is hereby directed to send a copy of this Order to all counsel of record, Magistrate Judge Hogg, and the United States Marshals Service.

---

10. In several other jurisdictions, the law clearly provides that a conviction, pursuant to a guilty plea, acts as a complete defense to a civil rights action asserting that an arrest was made without probable cause. *Williams v. Schario,* 93 F.3d 527 (8th Cir.1996); *Cameron v. Fogarty,* 806 F.2d 380 (2nd Cir.1986), *cert. denied,* 481 U.S. 1016, 107 S.Ct. 1894, 95 L.Ed.2d 501 (1987); *Rice v. Barnes,* 966 F.Supp. 877 (W.D.Mo.1997).