William C. WARDLAW, Appellant,

v.

William R. PICKETT, Deputy United States Marshal, et al., Appellees.

No. 91–5070.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 1993.

Decided Sept. 10, 1993.

Daniel M. Schember, Washington, DC, argued the cause, for appellant.

John R. Munich, Asst. U.S. Atty., Washington, DC, argued, for appellees. On brief were Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, DC. John C. Cleary, Asst. U.S. Atty., Washington, DC, also entered an appearance, for appellees.

Before BUCKLEY, D.H. GINSBURG and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

William Wardlaw brought a *Bivens* action [1] in district court seeking damages and alleging that United States Deputy Marshals William Pickett and Albert Crew violated his constitutional rights by using excessive force against him, falsely arresting him and wrongfully prosecuting him. Relying in part on the defendants' claims of qualified immunity, the district court granted them summary judgment. For the reasons explained below, we affirm the district court.

## I.

■ Wardlaw and the two deputies presented the district court with two very different accounts of the relevant events. Because we are reviewing the grant of summary judgment in favor of the defendants, we view "the facts in the record and all reasonable inferences derived therefrom in a light most favorable to the plaintiff." *Martin v. Malhoyt,* 830 F.2d 237, 253–54 (D.C.Cir.1987). Accordingly, we consider Wardlaw's version of events.

### A. Wardlaw's Account

On June 7, 1988, Wardlaw and John Heid were watching a hearing in a courtroom on the sixth floor of the United States Courthouse in Washington D.C. The hearing related to a lawsuit challenging conditions in a

---

1. In *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the plaintiff sought and recovered damages against federal employees for violation of his constitutional rights.

women's prison and, because the Marshal's office had received information leading it to believe that a demonstration might occur, security around the courtroom was especially tight. Late in the afternoon, the judge called a recess. Deputy Marshal Donald Horton observed that Heid refused to stand as the judge left the room. As the judge re-entered the courtroom after the recess, Horton approached Heid and told him to stand, but Heid resisted, saying that he stood for no one but God.

Deputy Horton then asked Heid to leave the courtroom but Heid again refused, telling Horton that he would leave only if carried out. Horton summoned Deputy Marshal Crew and together the two removed Heid, who went limp instead of resisting. Outside, Horton turned Heid over to Crew and Deputy Marshal Pickett, who had come to assist. Together, Pickett and Crew moved Heid to the stairwell to take him to the first floor and from there to eject him from the courthouse. Wardlaw, who had witnessed the events involving his friend, followed.

When Wardlaw first entered the stairwell, he saw Pickett holding Heid "like a sack of potatoes" and dragging him down the steps from the sixth floor. Crew accompanied Pickett and Heid. On a landing halfway to the fifth floor, according to Wardlaw, Pickett punched and kicked Heid. Simultaneously, Wardlaw rushed down the stairs toward Pickett, shouting out "Don't hurt him please.

He is totally nonviolent." Pickett turned and punched the approaching Wardlaw once in the jaw and two or three times in the chest.

Heid attempted to move but Crew restrained him. Heid then told Wardlaw to get the deputies' names. At that point, Wardlaw claims that Pickett said to Crew, "We better charge them with assault." Both Wardlaw and Heid were arrested and tried for assault. Deputies Pickett and Crew testified at the trial, at the conclusion of which Heid was convicted and Wardlaw was acquitted. *See United States v. Heid,* 904 F.2d 69 (D.C.Cir. 1990) (summarizing events at trial). Although Wardlaw acknowledges on appeal that he refused medical treatment for his injuries after the scuffle, he maintains that he experienced substantial pain in his chest and jaw over the next several months.[2]

## B. District Court Proceedings

In district court, Wardlaw alleged that Pickett and Crew committed numerous torts including false arrest, wrongful prosecution and use of excessive force.[3] In granting the deputies summary judgment on the false arrest and wrongful prosecution claims, the district court found that "there is simply no evidence of malice or bad faith on the part of the marshals." Mem. at 8. In addition, the court concluded that the marshals had probable cause to arrest Wardlaw for his role in the altercation.

---

**2.** As stated earlier, we must view the facts in the light most favorable to the plaintiff. Nevertheless, to provide the complete picture at this stage in the litigation, we note that Pickett and Crew give a different account of what occurred after the parties left the courtroom. The deputies claim they dragged Heid in a sitting position from the courtroom to the stairs. At the top of the stairs, they turned Heid over to face forward so that only his feet dragged on the ground. They then started down the stairs to the first floor in order to remove Heid from the courthouse. As they descended, Pickett and Crew claim they heard Wardlaw crash through the doors and run toward them, shouting "Let my friend go." Wardlaw reached the deputies almost instantaneously, collided with Pickett and caused Pickett to lose his grip on Heid. Pickett then spun around to block Wardlaw from reaching Heid. Because Wardlaw continued to struggle, Pickett struck him several times, landing one punch on his jaw and several others on his chest and ribs.

As a result of the collision, Heid regained his footing and Crew tried to restrain him. Suddenly, Heid broke free, leapt toward Pickett and attempted to tackle him from behind. Pickett swung around and threw one punch, hitting Heid in the face. The deputies then placed Heid and Wardlaw under arrest for assault.

**3.** Wardlaw also alleged that Pickett and Crew committed the common-law torts of assault, battery and false imprisonment. Under the Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679, the United States replaced Pickett and Crew as the defendant. Thus, no common-law tort claims now remain pending against any individual defendants. The district court denied the government's motion for summary judgment on the common-law claims and that denial is not before us on appeal.

■ The district court also granted the defendants summary judgment on the excessive force claim because it concluded that the "plaintiff's fourth amendment excessive force claim does not overcome the defense of qualified immunity." Mem. at 11. Qualified immunity protects a government official from suits for damages if the official's conduct did not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). To support its result, the court decided that "the unlawfulness of defendants' actions [was not] 'so apparent' that no reasonable officer could have believed in the lawfulness of his actions." Mem. at 10.

## II.

### A. *Excessive Force Claim Against Pickett*

Wardlaw's excessive force argument proceeds as follows. Wardlaw first asserts a common-law privilege to intervene in an arrest in which law enforcement officers use excessive force. Although we have not ruled on the existence or scope of that privilege, it has been recognized in other jurisdictions.[4] In addition, Wardlaw argues that two Supreme Court decisions could be interpreted as creating an inference that the privilege exists. In *Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976), the Supreme Court indicated that a claim pursued under 42 U.S.C. § 1983 should be interpreted in conformity with traditional tort defenses and immunities. And in *Butz v. Economou,* 438 U.S. 478, 500, 98 S.Ct. 2894, 2907, 57 L.Ed.2d 895 (1978), the Court stated that the law governing a *Bivens* action should mirror section 1983 law. Accordingly, Wardlaw asserts that the privilege was clearly established at the time the incident occurred.

Wardlaw next argues that he acted within the scope of the privilege in rushing down the stairs and shouting at the two deputies to desist. An intervenor, according to Wardlaw, may use force against the officers in proportion to the excess force the officers use against the arrestee. Because Pickett allegedly hit and kicked Heid, Wardlaw claims he was entitled to accost Pickett. Instead, he simply rushed down the steps shouting at Pickett; thus, Wardlaw claims he was well within the scope of the privilege. He maintains that Pickett, as the aggressor, had no right to resist and, by doing so, violated Wardlaw's clearly established right to intervene.

We find this argument unpersuasive for several reasons. First, we note that jurisdictions that have recognized the privilege to intervene in an arrest have recognized it as a defense to the intervenor's criminal and civil liability, not as a means of imposing liability on law enforcement officers. In some jurisdictions the privilege grows out of the *arrestee's* right to defend *himself* from the use of excessive force without incurring criminal liability. By coming to the arrestee's aid, an intervenor places himself in the arrestee's shoes and is entitled to defend himself. *See, e.g., State v. Anderson,* 40 N.C.App. 318, 253 S.E.2d 48 (1979); *State v. Wenger,* 58 Ohio St.2d 336, 12 O.O.3d 309, 390 N.E.2d 801 (1979). These jurisdictions, then, recognize that "one who comes to the aid of an arrestee must do so at his own peril." *State v. Gelinas,* 417 A.2d 1381, 1386 (R.I.1980). Other jurisdictions allow the intervenor to assert the privilege based on a reasonable but mistaken belief that excessive force was being used against the arrestee. *See, e.g., Graves v. United States,* 554 A.2d 1145 (D.C.App. 1989); *Commonwealth v. Martin,* 369 Mass.

---

**4.** *See, e.g., United States v. Grimes,* 413 F.2d 1376 (7th Cir.1969) (prisoner may intervene in defense of fellow prisoner he reasonably thinks to be victim of unauthorized, unprovoked assault by prison officials); *United States v. Ochoa,* 526 F.2d 1278, 1281 (5th Cir.1976) (right to defend third person from attack is defense to charge of assaulting federal officer); *Letson v. State,* 805 S.W.2d 801 (Tex.App.–Houston [14th Dist.] 1990); *State v. Smits,* 58 Wash.App. 333, 792 P.2d 565 (1990); *State v. Westlund,* 13 Wash.App.

460, 536 P.2d 20, 25 (1975) (bystander may come to aid of one being lawfully arrested by uniformed police officer if arrestee is in actual danger of serious physical injury); *Strube v. State,* 739 P.2d 1013 (Okla.Cr.1987); *State v. Gelinas,* 417 A.2d 1381, 1386 (R.I.1980); *State v. Anderson,* 40 N.C.App. 318, 253 S.E.2d 48 (1979); *State v. Wenger,* 58 Ohio St.2d 336, 12 O.O.3d 309, 390 N.E.2d 801 (1979); *Coleman v. State,* 320 A.2d 740 (Del.1974).

640, 341 N.E.2d 885 (1976). Even in these jurisdictions, however, the privilege constitutes no more than a recognition of a reluctance to impose liability on individuals who reasonably acted in an attempt to save others from what they perceived as serious, imminent danger. "[I]t is hardly conceivable that the law ... should mark as criminal those who intervene to protect others.... To the fear of involvement and of injury to oneself if one answered a call for help would be added the fear of possible criminal prosecution." *Commonwealth v. Martin*, 341 N.E.2d at 891; *cf. State v. Westlund*, 13 Wash.App. 460, 536 P.2d 20, 25 (1975) ("in rare circumstances, the brutality may be so dangerous to the arrestee that his resistance or the intervention of others is necessary to prevent death or serious disability"); *Commonwealth v. French*, 531 Pa. 42, 611 A.2d 175, 179 (1992) (referring to privilege as "justification" for action that would otherwise be criminal).

That concern, however, must be balanced against the ability of law enforcement officers to perform their duties. They must be free to use the reasonable force necessary to effect an arrest. Giving the privilege too broad a scope might easily deter officers from using force when it is necessary and justified. In recognition of this concern, some jurisdictions extend the privilege only to situations in which an officer uses excessive force capable of causing death or serious bodily injury.[5] *See e.g., Commonwealth v. French*, 611 A.2d at 175; *State v. Smits*, 58 Wash.App. 333, 792 P.2d 565, 569 (1990). Regardless of other distinctions among the jurisdictions that recognize the privilege, the privilege to intervene has *uniformly* been recognized as a shield, not a sword. It is applied to exempt from liability an intervenor

who reasonably attempts to save another from real danger. This rationale for the application of the privilege supports its use as a defense against criminal or civil liability but it does not justify using the privilege to impose liability on the arresting officers.

Moreover, using the privilege to assess a law enforcement officer's liability would create a framework for excessive force claims that places unrealistic and unjustifiable burdens on the officer. "The general rule of qualified immunity is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'" *Anderson v. Creighton*, 483 U.S. 635, 646, 107 S.Ct. 3034, 3042, 97 L.Ed.2d 523 (1987) (quoting *Davis v. Scherer*, 468 U.S. 183, 195, 104 S.Ct. 3012, 3019, 82 L.Ed.2d 139 (1984)). As the Supreme Court has recognized, "[t]hat security would be utterly defeated if officials were unable to determine whether they were protected by the rule without entangling themselves in the vagaries of the English and American common law." *Id.* Under the analysis that Wardlaw urges on us, an officer in Pickett's shoes would have to determine (1) whether he had used unreasonable force against Heid, (2) whether Wardlaw was rushing at him in order to intervene in the application of force or instead to attack him, (3) whether Wardlaw intended to use force against him, (4) whether the force Wardlaw was about to use was likely to be proportional to the force he had used on Heid and, finally, based on the officer's earlier conclusions, (5) whether he had any right to resist. Law enforcement officers are routinely required to make split second decisions but the number of decisions Wardlaw's analysis would mandate is troubling. Even more troubling, an officer would have no room for error in making his instantaneous assess-

---

5. Many states have also distinguished between the privilege to intervene in an illegal arrest, which they have abolished, and the privilege to intervene when an officer uses excessive force, which they retain. The elimination of the right to intervene to prevent an illegal arrest is based on the recognition that an arrestee's liberty interest is now protected by safeguards which did not exist at common law, including prompt arraignment, reasonable bail, appointment of counsel, the exclusionary rule and the right to a speedy trial. On the other hand, these safeguards do not

insulate an individual from the use of excessive force. *See, e.g., Miller v. State*, 462 P.2d 421 (Alaska 1969); *State v. Hatton*, 116 Ariz. 142, 568 P.2d 1040 (1977); *State v. Richardson*, 95 Idaho 446, 511 P.2d 263 (1973); *State v. Thomas*, 262 N.W.2d 607 (Iowa 1978); *State v. Austin*, 381 A.2d 652 (Me.1978); *Glover v. State*, 88 Md.App. 393, 594 A.2d 1224 (1991); *In re Welfare of Burns*, 284 N.W.2d 359 (Minn.1979); *State v. Nunes*, 546 S.W.2d 759 (Mo.Ct.App.1977); *State v. Koonce*, 89 N.J.Super. 169, 214 A.2d 428 (1965).

ments. Liability would result from any action that violated Wardlaw's privilege to intervene. But whenever a bystander seeks to intervene in an arrest, all parties face a dangerous and potentially explosive situation and Wardlaw's proposal would only heighten the danger and put both the officers and the arrestee in more precarious positions.

[redacted] Instead, we recognize that, whatever the circumstances prompting law enforcement officers to use force, whether it be self-defense, defense of another or resistance to arrest, where, as here, a fourth amendment violation is alleged, the inquiry remains whether the force applied was reasonable. Determining whether the force was reasonable requires us to balance the intrusion on the rights of the individual against the government interests at stake. *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989), the Supreme Court established the framework for the balancing, declaring that "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." [6] The objective reasonableness of the force used "must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872. Accordingly, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, ... violates the Fourth Amendment." *Id.* (internal cite omitted).

In *Graham,* however, the Supreme Court expressly reserved the question of the proper application of qualified immunity to a fourth amendment excessive force claim. Following *Graham,* several courts have found that qualified immunity does not require a second "objective reasonableness" analysis in the fourth amendment context. *See, e.g., Jackson v. Hoylman,* 933 F.2d 401, 402–03 (6th Cir.1991); *Dixon v. Richer,* 922 F.2d 1456, 1458 (10th Cir.1991). Although we have not previously answered the question, we have stated that "[w]e too doubt whether a substantively distinct qualified immunity defense would be available to an officer acting after *Graham.*" *Hunter v. District of Columbia,* 943 F.2d 69, 77 (D.C.Cir.1991).

[redacted] In general, qualified immunity extends to "government officials performing discretionary functions ... insofar as their conduct does not violate clearly established ... rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Qualified immunity, therefore, depends on the "objective legal reasonableness of the [official's] action." *Id.* at 819, 102 S.Ct. at 2738. Thus, the scope of qualified immunity must be evaluated using the same "objective reasonableness" criteria with which *Graham* directs us to scrutinize an officer's actions under the fourth amendment. We believe that standard provides the test for evaluating both the scope of the officer's qualified immunity as well as the plaintiff's claim of excessive force under the fourth amendment. We therefore now conclude, as we did in *Martin v. Malhoyt,* that a defendant's motion for summary judgment is to be denied only when, viewing the facts in the record and all reasonable inferences derived therefrom in the light most favorable to the plaintiff, a reasonable jury could conclude that the excessiveness of the force is so apparent that no reasonable officer could have believed in the lawfulness of his actions. *Martin,* 830 F.2d at 253–54.

[redacted] In applying this test to Wardlaw's account of events, we must consider all of the facts as well as the inferences arising from the facts. *See Hunter,* 943 F.2d at 76. Here, several factors suggest that Pickett's use of force was not so excessive that no reasonable officer could have believed in the lawfulness of his actions. First, Wardlaw does not dispute that the Marshal's office had taken additional security precautions the day of the hearing due to the nature of the claims being aired and the fact that the officers expected a demonstration of some sort. Pickett, having been warned of a demonstration, reasonably could have anticipated a con-

6. Even before *Graham,* we used an "objective reasonableness" standard to analyze excessive force claims. *See Martin v. Malhoyt,* 830 F.2d at 253.

frontation, especially while removing an uncooperative spectator from the courthouse. More importantly, when Wardlaw rushed down the stairs toward them, Pickett and Crew were in a vulnerable position, caught in a stairwell and moving an uncooperative individual. Wardlaw admits that he shouted at the deputies as he approached them, thus, again reasonably, raising a fear that he was about to attack. Furthermore, as Wardlaw acknowledges, Pickett hit him no more than three or four times—all in rapid succession. Once Wardlaw sat down on the stairs and it became apparent that he was not going to attack, Pickett did not hit him. Finally, Wardlaw did not consider his injuries severe enough to require medical attention.[7] Given these undisputed facts, we believe that no reasonable jury could find that Pickett's use of force was so excessive that no reasonable officer could have believed it to be lawful.

*B. Excessive Force Claim against Crew*

■ Wardlaw does not allege that Crew struck him or that Crew used any force against him at all. Instead, Wardlaw claims that Crew's liability results from his failure to intervene to protect Heid from Pickett, which action would have prevented Wardlaw's having to go to Heid's rescue. We find that no reasonable jury could conclude that Crew's inaction was such that a reasonable officer could not have thought it lawful. The entire confrontation lasted approximately ten to fifteen seconds. Even if Crew had attempted to intervene, he might not have succeeded in separating Pickett and Heid any faster than their own actions and reactions did. Accordingly, we affirm the district court's grant of summary judgment to Crew on this claim.

*C. False Arrest Claims against Crew and Pickett*

■ Where, as here, a false arrest claim is based on a warrantless arrest, the defendant officers must establish probable cause

to arrest. *Dellums v. Powell,* 566 F.2d 167, 175 (D.C.Cir.1977). Pickett and Crew admit they had no warrant but they assert that they had probable cause to arrest Wardlaw for assault. They also assert their qualified immunity. In *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), the Supreme Court held that an officer retains qualified immunity from suit if he had an objectively reasonable basis for believing that the facts and circumstances surrounding the arrest were sufficient to establish probable cause.

■ Here, Wardlaw's version of the facts supports the conclusion that probable cause existed. Wardlaw admits to bursting through the stairwell doors, rushing down a flight of steps toward the officers and shouting at them not to hurt Heid. These facts give rise to a reasonable inference that Wardlaw was about to assault the deputies. Pickett's immediate confrontation with Wardlaw did nothing to negate that inference. Accordingly, we conclude that the deputies had probable cause to arrest Wardlaw for assault.

■ Even were we to conclude that probable cause did not exist, we would nonetheless find the deputies immune from suit. Qualified immunity shields Pickett and Crew "from suit for damages if 'a reasonable officer could have believed [Wardlaw's arrest] to be lawful, in light of clearly established law and the information the officers possessed.'" *Hunter v. Bryant,* — U.S. —, —, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987)). Pickett and Crew are entitled to qualified immunity even if they "reasonably but mistakenly" concluded that probable cause existed. *Id.* Officials who make reasonable errors retain their immunity so that they do "not err always on the side of caution because they fear being sued." *Id.* — U.S. at —, 112 S.Ct. at 537.

7. By considering this factor, we do not suggest that an individual *must* suffer significant injuries in order for the force used to be unreasonable. Although the severity of Wardlaw's injuries is not by itself the basis for deciding whether the force used was excessive, it does provide some indica-

tion of the degree of force Pickett used. Thus, it is a relevant factor under a "test of reasonableness ... not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

When Wardlaw shouted and ran down the steps toward Pickett, the deputies were in the middle of a stairwell landing, fully occupied with attempting to remove a limp and uncooperative Heid. Wardlaw's actions could have reasonably made him appear to be an aggressor seeking to secure Heid's release. In this situation, an objectively reasonable officer could have believed that charging Wardlaw with assault was lawful. Thus, even assuming *arguendo* that Pickett and Crew (as well as the grand jury that subsequently indicted both Heid and Wardlaw) erred in charging Wardlaw, the deputies would nonetheless be entitled to immunity from suit because their decision to arrest Wardlaw was reasonable.

### D. Wrongful Prosecution Claims Against Pickett and Crew

A plaintiff may bring an action against officials who institute and pursue a prosecution without probable cause if the plaintiff can allege injury of a constitutional magnitude. *See Goodwin v. Metts,* 885 F.2d 157, 163 (4th Cir.1989). Here, we need not determine whether Wardlaw suffered such injury because we have already concluded (1) that the deputies had probable cause and (2) that even assuming *arguendo* that probable cause was lacking, the deputies' conclusion that probable cause existed was objectively reasonable. These conclusions entitle Pickett and Crew to summary judgment on the wrongful prosecution claim because the absence of probable cause is an essential element of the claim.

### III.

We reject Wardlaw's contention that the privilege to intervene in an arrest to protect the arrestee may be used as a sword to impose liability on an officer who allegedly uses excessive force against the intervenor. To the extent that it exists at common law, the privilege merely shields the intervenor from criminal and civil liability. An intervenor's excessive force claim, then, is more appropriately analyzed under the standard objective reasonableness rubric enunciated by the Supreme Court in *Graham.* We hold that no reasonable jury could conclude that the excessiveness of Pickett's and Crew's actions was so apparent that no reasonable officer could conclude they acted lawfully. Accordingly, we affirm the grant of summary judgment in their favor.

We also affirm the district court's grant of summary judgment to the defendant officers on Wardlaw's false arrest and wrongful prosecution claims. The facts, as Wardlaw alleges them, support a finding of probable cause to arrest him. Even if probable cause were lacking, we think the facts sufficient to support the finding that the officers acted on an objectively reasonable, even if mistaken, belief that probable cause existed, thus entitling them to qualified immunity. Accordingly, the judgment of the district court is

AFFIRMED.