# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 9, 2014　　　　Decided February 13, 2015

No. 13-5130

MICHAEL FENWICK,
APPELLEE

v.

ANDREW PUDIMOTT AND JEREMY FISCHER,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:07-cv-02330)

*W. Mark Nebeker*, Assistant U.S. Attorney, argued the cause for appellants. With him on the briefs were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

*David L. Shurtz* argued the cause and filed the briefs for appellee Michael Fenwick.

Before: HENDERSON, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

Concurring opinion filed by *Circuit Judge* HENDERSON.

TATEL, *Circuit Judge*: In this damages action against three deputy federal marshals, the plaintiff alleges that the officers violated the Fourth Amendment when they used deadly force against him. The officers moved for summary judgment based on qualified immunity, the district court denied the motion, and the officers now appeal. We reverse. Under the circumstances of this case, we conclude that the deputies violated no clearly established law and are therefore entitled to qualified immunity.

**I.**

In January 2007, then sixteen-year-old Michael Fenwick pulled into the parking lot of an apartment complex in southeast Washington, D.C. Close by were three deputy marshals—Andrew Pudimott, Jeremy Fischer, and John Mickle—waiting to enforce an eviction order. The deputies watched as Fenwick struggled and failed to properly park his car before entering an apartment building to look for his girlfriend. Given Fenwick's youthful appearance and difficulty at the wheel, and observing that the car's door lock was broken, the officers suspected that he was underage and driving a stolen vehicle. Before they could confirm as much, however, Fenwick reappeared and headed towards his car. Surveillance footage from nearby security cameras shows that, at that time, pedestrians were entering and exiting the apartment buildings, a car was pulling out of the apartment complex, and several other vehicles were passing on the adjacent street. The officers, still across the parking lot, called to Fenwick and asked to speak with him. Fenwick responded by pointing to his chest as if saying, "Who, me?" But instead of stopping to speak with the deputies, Fenwick got into his car and began backing up. The deputies rushed to surround the vehicle and, with guns drawn, ordered Fenwick to halt. Fenwick ignored the order.

Instead, although Deputy Pudimott was visible near the driver-side front of the vehicle, Fenwick drove forward towards the parking lot exit, clipping Pudimott with the car's side mirror. Fearing for "the safety of themselves, fellow officers, and/or possibly other bystanders," Mot. to Dismiss and/or for Summ. J. 26, Pudimott and Fischer opened fire, striking Fenwick with four bullets.

After Fenwick recovered from his wounds, he was charged as a juvenile with three counts of felony assault on a police officer—one for each of the deputies on the scene. *See* D.C. Code § 22-405(c). Pursuant to D.C. Code Section 22-4502, the District also sought a sentence enhancement on each charge "for committing [the] crime when armed." The enhancement was based not on possession of a pistol or any of the statute's other enumerated weapons, such as machine guns, rifles, or switchblades, but rather on Fenwick's operation of the vehicle itself. Following a bench trial in Superior Court, the judge acquitted Fenwick of the charges with respect to Mickle and Fischer, but found that Fenwick committed armed assault on Pudimott when he endangered the officer by accelerating forward while the officer was near the front of the car. The District of Columbia Court of Appeals affirmed the "adjudication" (labeled as such because Fenwick was a juvenile), concluding that "[w]hen operated with the intention to make one's getaway, and without evident regard for the safety of officers who were trying to persuade the driver to stop, a moving car may well constitute a dangerous weapon capable of causing death or grave injury." *See In re M.T.F.*, 10 A.3d 1158 (D.C. 2010).

Several months later, Fenwick sued the three officers in their individual capacities in the U.S. District Court for the District of Columbia, alleging that their use of deadly force was excessive and thus violated the Fourth Amendment. *See*

*Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971) (establishing damages action against federal officials for violations of constitutional rights). The deputies moved for summary judgment, contending that in light of Fenwick's juvenile assault adjudication, his Fourth Amendment claim was barred both by collateral estoppel and *Heck v. Humphrey*, 512 U.S. 477, 487 (1994) (holding that district courts must dismiss damages suits against law enforcement officials that would "necessarily imply the invalidity of [an underlying] conviction"). Mot. to Dismiss and/or for Summ. J. 14. Critically for our purposes, the deputies also asserted qualified immunity. *Id.* 19–20.

The district court granted summary judgment to Mickle, who never fired his weapon, but denied the motion with respect to Pudimott and Fischer. Beginning with the deputies' preclusion arguments, the court explained that under District of Columbia law, "collateral estoppel 'precludes the relitigation of issues actually litigated and necessary to the outcome of a prior case involving the party against whom estoppel is asserted.'" *Fenwick v. United States*, 926 F. Supp. 2d 201, 210 (D.D.C. 2013) (quoting *Carr v. Rose*, 701 A.2d 1065, 1076 (D.C. 1997)). Similarly, the district court observed, *Heck v. Humphrey* bars *Bivens* suits "that, if successful, would *necessarily* imply the invalidity of the plaintiff's conviction or sentence." *Id.* at 219 (quoting *Taylor v. U.S. Probation Office*, 409 F.3d 426, 427 (D.C. Cir. 2005)). But recognizing that the excessive force issue was neither litigated nor necessary to the outcome of Fenwick's assault prosecution, and that a ruling in Fenwick's favor on his excessive force claim would not "necessarily imply the invalidity" of the assault judgment, the district court determined that the assault judgment did not altogether bar Fenwick's excessive force claims against Pudimott and Fischer. *Id.* at 216–17, 222. The court explained, however, that collateral estoppel and *Heck v. Humphrey* did

preclude Fenwick from asserting, as alleged in his complaint, (1) that the deputies were never in any danger of being hit by the vehicle, or (2) that they opened fire before Fenwick began accelerating forward with Pudimott near the front of the car, since findings to the contrary *were* necessary to Fenwick's juvenile adjudication. *Id.* at 217–18, 220–22.

As to the officers' assertion of qualified immunity, the district court determined that genuine issues of material fact—in particular, whether the officers shot Fenwick while Pudimott was still in danger from Fenwick's car—precluded summary judgment. Noting that claims of qualified immunity are assessed through the Fourth Amendment's objective reasonableness lens, the court explained that officers may use deadly force only when a "suspect poses a threat of serious physical harm" to others. *Id.* at 225–26 (quoting *Tennesse v. Garner*, 471 U.S. 1, 11 (1985)). In the court's view, then, the officers' use of deadly force could be "justified only as a response to the threat Mr. Fenwick posed to Deputy Pudimott," *id.* at 226, and a reasonable jury could find that the deputies shot Fenwick after it had become clear that the danger to Pudimott had passed, *id.* at 225. "If so," the district court concluded, "then under the circumstances of this case[,] the deputies violated Mr. Fenwick's clearly established constitutional rights." *Id.* at 225.

On appeal, the deputies challenge the district court's denial of their motion for summary judgment, renewing their assertion of qualified immunity. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–19 (2014) (officers denied qualified immunity on summary judgment may immediately appeal when the appeal "raise[s] legal issues"). We review *de novo* the district court's denial of summary judgment. *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

6

**II.**

In order to protect officers "from undue interference with their duties and from potentially disabling threats of liability," qualified immunity shields federal officials from damages suits for actions taken while carrying out their official duties. *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). To defeat a defense of qualified immunity, a plaintiff must show not only that an official "violated a constitutional right" but also that "the right was clearly established" at the time of the violation. *Saucier v. Katz,* 533 U.S. 194, 200–01 (2001). The Supreme Court has clarified, however, that courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011). As the Court has explained, the two-step protocol is ill-suited to certain cases, including those in which the clearly-established-law analysis is cut and dried while the constitutional question presents a close, heavily fact-bound inquiry. *See Pearson v. Callahan*, 555 U.S. 223, 237 (2009).

Our concurring colleague would have us decide this case at the first step and hold that, pursuant to *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), the deputies' actions plainly complied with the Fourth Amendment. In our view, however, the constitutional question is hardly clear, and *Plumhoff*—a case in which the fleeing suspect led police on a protracted high-speed chase, *id.* at 2017—has little to say about the quite different situation the deputies faced here. The officers in *Plumhoff* resorted to deadly force only after the suspect placed in peril the lives of dozens of innocent civilians during his 100 mile-per-hour flight and only after they sought to end the chase through non-lethal means. *Id.* In this case, by contrast, although the deputies opened fire after Fenwick clipped Officer Pudimott with the car's side-view mirror, Fenwick posed no immediate threat to either officers or bystanders at the

time of the shooting. *See infra* at 8–9; *Garner*, 471 U.S. at 11. Given these significant differences between this case and *Plumhoff*, we think the constitutional question is "far from obvious," *Pearson*, 555 U.S. at 237, and that this case is therefore best resolved at the second step. We thus proceed directly to consider whether the deputies' use of deadly force violated law that was clearly established at the time of the shooting.

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. Because this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition," *id.* at 201, it requires that we take a closer look at the facts. And since the district court decided this case on a motion for summary judgment, we must take the facts and draw reasonable inferences in the light most favorable to the party opposing summary judgment—here, in the light most favorable to Fenwick. *See Scott v. Harris*, 550 U.S. 376, 378 (2007).

This case features an "added wrinkle": a videotape capturing the incident in question. *Id.* In *Scott v. Harris*, the Supreme Court instructed that we must "view[] the facts in the light depicted by the videotape." *Id.* at 381. But in contrast to the videotape in *Scott*, which "quite clearly" portrayed the events at issue, *id.* at 378, the surveillance footage here does no such thing. True, it shows that a few pedestrians and vehicles were on the scene in the minutes before the officers opened fire, but it sheds almost no light on the shooting itself. As both the District Court and the D.C. Superior Court observed, the video is blurry and soundless, and the shooting occurs while Fenwick's vehicle and all of the officers are obscured by the dark shadow of an adjacent building. *Fenwick*, 926 F. Supp. 2d

at 226–27 (noting Superior Court's description of the footage and outlining video evidence in detail). The videotape thus provides no "ready answers to the factual dispute" and does little to affect our analysis. *Id.* at 227.

But other important wrinkles—namely, the *Heck* bar and collateral estoppel—constrain how we view the facts. As the district court explained, the Superior Court Judge, in finding that Fenwick committed felony assault on Pudimott, "necessarily determined that [Fenwick] created 'a grave risk of causing significant bodily injury' to Deputy Pudimott when, 'without justifiable [and] excusable cause,' he drove the car forward in a manner that put the deputy in danger of being hit." *Id.* at 215 (quoting D.C. Code § 22-405(b) & (c)) (internal quotation marks added). Although Fenwick urges us to ignore these "bad facts," Appellee's Br. 50, we are bound by *Heck v. Humphrey* and the Supreme Court's admonishment that "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81 (1984); *see also supra* at 4 (explaining requirements of collateral estoppel under D.C. law).

That said, several facts weigh in Fenwick's favor, including (1) the deputies' concession in this court that Pudimott and Fischer fired on Fenwick only *after* the vehicle struck Pudimott, when Pudimott was no longer in the car's path, Appellants' Br. 7, 12, (2) the Superior Court's findings that Fenwick did nothing to endanger Mickle or Fischer during his flight, *see Fenwick*, 926 F. Supp. 2d at 215 (reproducing Superior Court findings), and (3) the surveillance footage showing no bystanders in the path of Fenwick's car.

Thus distilled the record reveals, on the one hand, that the deputies confronted a fleeing motorist who posed no immediate threat to either officers or bystanders when they opened fire, and on the other hand, that the deputies had observed pedestrians and vehicles close by in the minutes leading up to the shooting and, just moments before firing, had seen the fleeing suspect "create[] a grave risk of causing significant bodily injury to [an] officer." D.C. Code § 22-405(c). With "the specific context of th[is] case" now in mind, *Saucier*, 533 U.S. at 201, we turn to the officers' claim that their use of deadly force to apprehend Fenwick "to protect one or more of the deputies or members of the general public from harm," Appellants' Br. 22, violated no clearly established law.

## III.

To assess the officers' claim of qualified immunity, "we look to cases from the Supreme Court and this court" and, if neither provides an answer, "to cases from other courts exhibiting a consensus view." *Johnson v. D.C.*, 528 F.3d 969, 976 (D.C. Cir. 2008). We agree with the deputies that our inquiry begins and ends with Supreme Court precedent—in particular, *Brosseau v. Haugen*, 543 U.S. 194 (2004).

In *Brosseau*, three officers sought to catch a suspect wanted on drug charges. After pursuing him on foot for the better part of an hour, one of the officers chased the suspect back to his car, and, pounding on the driver's window with her handgun, ordered the suspect to stop. When the suspect ignored the order and began to accelerate forward, the officer fired through the rear driver-side window, striking the suspect in the back. The officer later testified that she shot the suspect out of fear for the safety of "other officers on foot" who, she believed, were close by, and for "occupied vehicles" in the

suspect's path, and for anyone else who "might be in the area." *Id.* at 197. The suspect survived and later pleaded guilty to the felony of "eluding," thereby "admitt[ing] that he drove his [vehicle] in a manner indicating 'a wanton or willful disregard for the lives . . . of others.'" *Id.* (quoting Wash. Rev. Code § 46.61.024 (1994)).

Reviewing these facts and relevant precedent, the Supreme Court "express[ed] no view" on the Fourth Amendment question, but determined that the officer was entitled to qualified immunity as her actions "fell in the hazy border between excessive and acceptable force." *Id.* at 201 (citation omitted). For us to reach a different conclusion about qualified immunity in this case, Fenwick must show either that the deputies' conduct was "materially different from the conduct in *Brosseau*" or that between the incident in *Brosseau* and January 2007—when Fenwick was shot—there "emerged either controlling authority or a robust consensus of cases of persuasive authority that would alter our analysis." *Plumhoff*, 134 S. Ct. at 2023 (citations and internal quotation marks omitted).

Fenwick has done neither. He has made no attempt to distinguish *Brosseau*, and we doubt he could do so in a meaningful way. Although record evidence in both *Brosseau* and this case reveals a suspect attempting to flee who posed no immediate threat to any officer or bystander when the officers fired, *see supra* at 6–7; *Brosseau*, 543 U.S. at 204 (Stevens, J., dissenting) (describing record evidence in more detail than, but consistent with, majority opinion), trial courts in both cases had determined that the suspects were driving in a reckless and dangerous manner, *see* D.C. Code § 22-405 (c); Wash. Rev. Code § 46.61.024 (1994), and the officers in both cases justified their use of deadly force by claiming concern for the safety of other officers and bystanders. Nor has Fenwick

shown that *Brosseau*'s analysis had become obsolete at the time the deputies shot him. In fact, he has failed to point to "any case—let alone a controlling case or a robust consensus of cases—decided between [the events in *Brosseau*] and 200[7] that could be said to have clearly established the unconstitutionality of using lethal force" in this situation. *Plumhoff*, 134. S. Ct. at 2024. For these reasons, unlike the district court, we see no genuine issue of material fact that precludes summary judgment for the deputies based on qualified immunity. Whether the deputies shot Fenwick while Pudimott was still in danger from Fenwick's car, or whether they shot him in the seconds after that danger had passed, *Brosseau* makes clear that the deputies' use of deadly force violated no law that was clearly established at the time of the shooting.

In reaching this conclusion, we emphasize that nothing in this opinion should be read to suggest that qualified immunity will shield from liability every law enforcement officer in this circuit who fires on a fleeing motorist out of asserted concern for other officers and bystanders. Outside the context of a "dangerous high-speed car chase," *Scott*, 550 U.S. at 386, deadly force, as the Supreme Court made clear in *Garner*, 471 U.S. at 11, ordinarily may not be used to apprehend a fleeing suspect who poses no immediate threat to others—whether or not the suspect is behind the wheel. Here, however, the Superior Court determined that moments before the shooting, Fenwick's driving had posed a "grave risk of causing significant bodily injury" to an officer, D.C. Code § 22-405(c), and that conclusion binds us, *see supra* at 6. Because Fenwick operated his car in a way that endangered an officer, in an area recently traversed by pedestrians and other vehicles no less, it was not clearly established that the deputies violated the Fourth Amendment by using deadly force to prevent his flight. Accordingly, we cannot say that Pudimott and Fischer had

"fair notice that [their] conduct was unlawful." *Brosseau*, 543 U.S. at 198. The deputies are therefore entitled to qualified immunity.

The judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in the judgment: I agree with my colleagues that the deputies are plainly entitled to qualified immunity. Maj. Op. 12. I further agree that our inquiry starts and ends with United States Supreme Court precedent. *See* Maj. Op. 9. But in my view, it is the Supreme Court's more recent opinion in *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014), that controls Fenwick's case. And, in contrast with *Brosseau v. Haugen*, 543 U.S. 194 (2004), which speaks only to the second qualified-immunity inquiry—"whether the deputies' use of deadly force violated law that was clearly established at the time of the shooting," Maj. Op. 7—*Plumhoff* establishes that the deputies' actions were "objectively reasonable in light of the facts and circumstances confronting them." *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993) (internal quotation marks omitted). Accordingly, their actions did not violate Fenwick's Fourth Amendment rights at all.

In *Plumhoff*, a police officer stopped Rickard's car because one of the headlights was out. 134 S. Ct. at 2017. Rickard appeared nervous and could not produce his driver's license on request so the officer asked him to step out of the car. *Id.* Instead of complying, Rickard accelerated the car and led police on a high-speed chase. *Id.* During his attempted escape, Rickard repeatedly caused "contact to occur" between his car and police cruisers. *Id.* (brackets omitted). Eventually, Rickard found his car penned in by police cruisers but he continued to "us[e] the accelerator" in an attempt to escape. *Id.* At that point—and even though Rickard's car "came temporarily to a near standstill," *id*. at 2021—an officer fired three shots into his car. *Id*. at 2017. Rickard "then reversed in a 180 degree arc and maneuvered onto another street, forcing [another officer] to step to his right to avoid the vehicle." *Id.* (internal quotation marks omitted). And then, *after* Rickard's car had passed the officer and Rickard "continued fleeing," officers "fired 12 shots toward Rickard's car, bringing the total number of shots fired

during th[e] incident to 15." *Id.* at 2018 (internal quotation marks omitted). Rickard and his passenger were killed. *Id.*

The Supreme Court held that the officers were shielded by qualified immunity because the officers' use of deadly force "did not violate the Fourth Amendment." *Id.* at 2022. The Court reached this conclusion because "Rickard's outrageously reckless driving posed a grave public safety risk," *id.* at 2021, and when the officers opened fire, the only thing "a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road." *Id*. at 2022. Moreover, the Supreme Court held that firing 15 shots—12 of which occurred after Rickard had maneuvered past officers and "continued fleeing," *id.* at 2018 (internal quotation marks omitted)—was reasonable because, "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* at 2022.

Although Fenwick's case lacks the drama of the high-speed chase in *Plumhoff*, the factual differences between *Plumhoff* and Fenwick's case do not make the former inapposite. Rather, the principle animating *Plumhoff* is dispositive here. As the district court, in summarizing the relevant portion of the superior court's findings, put it, Fenwick "created a grave risk of causing significant bodily injury to Deputy Pudimott when, without justifiable or excusable cause, he drove the car forward in a manner that put the deputy in danger of being hit." *Fenwick v. United States*, 926 F. Supp. 2d 201, 215 (D.D.C. 2013). Based on the "grave public safety risk" that Fenwick created, *Plumhoff* establishes that the deputies "acted reasonably in using deadly force." 134 S. Ct. at 2022.

My colleagues consider "the constitutional question" in this case to be "close." Maj. Op. 6. But the "facts [that] weigh in Fenwick's favor" are largely immaterial. Maj. Op. 8. My colleagues also find significant "the deputies' concession" that they "fired on Fenwick only *after* the vehicle struck Pudimott, when Pudimott was no longer in the car's path." Maj. Op. 8 (emphasis in original). But under *Plumhoff*, once Fenwick threatened bodily injury to Pudimott, the deputies were not obligated to stop firing "until the threat ha[d] ended." 134 S. Ct. at 2022. And nothing in the record demonstrates that a reasonable officer would have concluded, in the few seconds that passed after Fenwick's car struck Pudimott, that Fenwick was no longer dangerous.[1]

Nor does it matter that "the surveillance footage show[ed] no bystanders in the path of Fenwick's car." Maj. Op. 8. The Supreme Court has made plain that law enforcement officers may use deadly force to stop a suspect who poses "an actual and imminent threat to the lives of any pedestrians who *might* [be] present, to other civilian motorists, and to the officers involved," *Scott v. Harris*, 550 U.S. 372, 384 (2007), and not only to protect civilians who, upon a *post hoc* review of security-camera footage, were in fact found to have been in the path of a fleeing suspect's car. Here, the deputies had

---

[1] My colleagues distinguish *Plumhoff*, in part, because the officers in that case resorted to deadly force only after they "sought to end the chase through non-lethal means." Maj. Op. 6. But the Supreme Court has long held—indeed, since *Tennessee v. Garner*—that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. 1, 11 (1985). To the extent the majority opinion implies that law enforcement officers must first try non-lethal means to neutralize a deadly threat or risk violating the Fourth Amendment, it is irreconcilable with a decades-long line of U.S. Supreme Court precedent. *See Brosseau*, 543 U.S. at 197–98 (quoting *Garner*, 471 U.S. at 11).

4

every reason to believe that civilians "might" be in harm's way if the deputies did not neutralize the threat Fenwick's reckless behavior posed. *See id.* As my colleagues recognize, the deputies "observed pedestrians and vehicles close by in the minutes leading up to the shooting." Maj. Op. 9.

We are, of course, bound to analyze the qualified-immunity question "from the perspective 'of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " *Plumhoff*, 134 S. Ct. at 2020 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). We must also "allo[w] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Although the videotape of the shooting "sheds almost no light on the shooting itself," Maj. Op. 7, it plainly shows that the deputies had precious few seconds to decide how best to neutralize the threat Fenwick presented when he ignored the deputies' commands and instead aimed his motor vehicle towards one of them. On these facts, the deputies' actions were "objectively reasonable in light of the facts and circumstances confronting them," *Wardlaw*, 1 F.3d at 1303 (internal quotation marks omitted), and I would hold that they are entitled to qualified immunity because they did not violate the Fourth Amendment.[2]

---

[2] Although this point is necessarily incorporated in the body of my concurrence, to the extent that my colleagues' statement that Pudimott and Fischer did not have "fair notice that [their] conduct was unlawful," Maj. Op. 12, can be read as opining that the deputies' conduct in fact violated the Fourth Amendment, I disagree.